[Civ. No. 5717. Fourth Dist. Aug. 20, 1959.]

ORANGE COUNTY WATER DISTRICT (a Corporation),
Respondent, v. CITY OF RIVERSIDE et al., Appellants.

144

146

148

150

Leo A. Deegan and Albert H. Ford, City Attorneys (Riverside), Harry M. Dougherty, Deputy City Attorney, Cosgrove, Cramer, Diether & Rindge, Leonard A. Diether, Gordon Pearce, William A. Flory and Ralph H. Prince, City Attorneys (San Bernardino), Martin C. Casey and Lawrence A. Hutton, City Attorneys (Colton), Edward F. Taylor, City Attorney (Redlands), Douglas L. Edmonds, DeWitt A. Higgs and James L. King for Appellants.

Best, Best & Krieger, James H. Krieger, Arthur L. Littleworth, Surr & Hellyer and John B. Surr as Amici Curiae on behalf of Appellants.

Rutan, Lindsay, Dahl, Smedegaard, Howell & Tucker, A. W. Rutan, Rodger Howell, Milford W. Dahl, Pillsbury, Madison & Sutro, Eugene M. Prince, Eugene D. Bennett, James Michael and Samuel L. Wright for Respondent.

HAINES, J. pro tem.* — This action is brought by the Orange County Water District, a public corporation, created and existing under a California statute (Stats. 1933, ch. 924, p. 2400), as from time to time amended. This district is invested with broad powers affecting the water supply for the area within its exterior boundaries—an area wholly within Orange County, but which, as now extended, contains *inter alia* the cities of Fullerton, Anaheim, Orange, Santa Ana and Huntington Beach. Section 2, subdivision 7 of the act involved, as amended in 1953 (Stats. 1953, ch. 770, pp. 2035, 2050), having to do with the powers of the district provides, in part, as follows:

" . . . to commence, maintain, intervene in, defend and compromise in the name of said district, or otherwise, and to assume the costs and expenses of any and all actions and proceedings now or hereafter begun to prevent interference with water or water rights used or useful to lands within said district, or diminution of the quantity or pollution or con-

*Assigned by Chairman of Judicial Council.

tamination of the water supply of said district, or to prevent unlawful exportation of water from said district, or to prevent any interference with the water or water rights used or useful in said district which may endanger or damage the inhabitants, lands or use of water in said district. . . ."

The present action, claimed to be maintainable under these statutory provisions joins no other parties plaintiff with the district, nor are there any other parties defendant than the four cities of San Bernardino, Redlands, Colton, and Riverside. What was sought in the complaint and what the judgment undertook to award, was, first, a declaration and definition of the extent of the respective rights of the defendant cities to take water from the surface and underground flows of the Santa Ana River and its tributaries and from the underground basins, reservoirs or lakes into which these flows diffuse themselves in their descent from the mountainous area where the streams have their origin to the several points where they are diverted by the defendant cities; and, second, injunctive relief forbidding the defendant cities severally, except for certain temporary arrangements, to divert such waters to any extent in excess of their rights as there declared.

As respects the geographical situation the trial court found that:

"At all times herein mentioned the Santa Ana River has been and now is a natural nonnavigable stream which rises in the San Bernardino Mountains in San Bernardino County, California, northeasterly from the City of San Bernardino and flows down from said mountains through the San Bernardino valley or plain in said county in a southwesterly direction to and into Riverside County, California, and thence through the northwestern portion of said Riverside County to and into the County of Orange, California, through the Santa Ana Mountains and thence to the coastal plain situated within said Orange County and the plaintiff District, where the waters of said Santa Ana River then sink underground except for portions thereof which during certain periods of large storms pass on down the channel of the river and into the Pacific Ocean.

"The watershed of the Santa Ana River embraces approximately 2,000 square miles, the boundaries of which are delineated on plaintiff's Exhibit No. 1 in evidence.

"From the standpoints of geography, geology and hydrology, the Santa Ana River system is one watershed and one basin. It has been and can be divided into three general

subdivisions, which, for convenience, are referred to herein as the Upper Basin, the Middle Basin and the Lower Basin, each of which is delineated on plaintiff's Exhibit No. 1 in evidence. The boundaries of said subdivisions are generally protrusions of the bedrock, faults, relatively impervious zones or in some cases arbitrary lines drawn in order to completely bound the area so designated. Irrespective of the method of division used, any such subdivisions or further divisions are parts of the entire Santa Ana River system, and all the waters thereof, underground and surface alike, are part of one interconnected common supply. In all cases, except those of continuous protrusions of the bedrock, some restricted underflow across the boundaries of such subdivisions is possible and water passes underground as well as on the surface, from one subdivision to the next lower subdivision.''

The trial court also found that:

''Numerous streams within the watershed are tributary to the Santa Ana River. The waters of the natural, usual and ordinary flow of the Santa Ana River and its said tributaries, when permitted without interruption or interference and when not artificially diverted or extracted, naturally and normally flow down in their respective channels through, over and across the Upper and Middle Basins and into the Lower Basin. The surface lands in said basins are underlaid to various depths with alluvial deposits composed of boulders, gravel, clay, sand, silt and other fluvial and detrital materials of varying textures, all of which materials have been laid down by said Santa Ana River and its tributaries. In a state of nature said materials are saturated with waters supplied by said Santa Ana River and its tributaries which waters percolate and flow as a continuous body of underground waters and which in turn supply, support and contribute to the surface flow of the Santa Ana River.

''The upper basin is bounded on its southwesterly side by an underground barrier or dike, which is generally known as 'Bunker Hill Dike' and which is sufficiently impervious throughout most of its length to retard the flow of underground waters and to prevent the escape of such waters below the surface to any great extent. . . .''

Complaint is made in one of the briefs of the repeated use by counsel for the respondent district and by the trial court in its findings and judgment of the expression ''Santa Ana River System,'' without definition of what is meant thereby.

To avoid any uncertainty we here state that what we shall, in this opinion, mean, whenever we shall use the expression, and what we understand the trial court to have meant by it, is the entire natural flows of the Santa Ana River and its tributaries insofar as they proceed in known and definite channels, whether above ground or below the surface, together with all waters from time to time impounded either in surface lakes or known or ascertainable underground storage basins, wherever overflows from such lakes or basins, through either surface or underground outlets, do or under natural conditions did, directly or indirectly feed the flows of the river or its tributaries.

As a matter of fact neither the river itself nor its tributaries, after leaving the mountains, run continuously for all of their distances on the surface, but for many of their stretches most of them sink into and percolate through sands and gravel. At intervals, however, the general downstream trend of these flows and percolations is interrupted by such natural dikes or dams, as those mentioned in the findings quoted, partially but not entirely impermeable. Behind these dams, which do not always rise as far as the surface of the ground, the water backs up wherever they occur and charges underground basins, reservoirs or lakes in which it is impounded, as noted by the trial court, and in which it is stored in great quantities, in various permeable formations. The amount of this storage in any given basin varies, of course, from year to year, depending in part on the character of the subsoil, in part on the general rainfall in the region, in part on the proportion between the inflow into the basin from above and its outflow below, and in part on artificial drafts made upon its waters. When these dikes or dams occur, more or less of the water above them, whenever the basin is sufficiently full, is brought to the surface. Either upon, or beneath the surface, or partially above and partially beneath it, the water of the stream, at such times, spills over the lip or rim of the underground basin and resumes its general downward course toward the sea.

Reference to the map, plaintiff's Exhibit I, in evidence, referred to as above by the trial court, will disclose that the three "basins" described in the findings occupy areas approximately as follows:

The "Upper Basin" is depicted as occupying the San Bernardino Valley from the base of the mountains on the north and northeast, downward until it is interrupted by

the long northwesterly to southeasterly barrier known as the "Bunker Hill Dike," probably the most prominent, so far as its effect on the stream flows is concerned, of the numerous natural dikes or dams above described.

The "Middle Basin," to use the nomenclature used by the trial court, embraces the whole area of the watershed below the "Bunker Hill Dike," down to another obstruction labeled on the said map "Chino Fault" lying just above the Prado Dam hereinafter referred to.

Everything below the last named barrier is included in what the trial court described as the "Lower Basin."

Both the "Upper" and the "Middle Basin" referred to in the findings are, in fact, further divisible by natural barriers, of varying degrees of prominence, into smaller basins, and are so treated in the briefs of defendant cities in discussing them, and it will, therefore, be convenient at this point to distinguish them. The "Upper Basin" is treated in the briefs of counsel for the cities of Redlands, San Bernardino, and Colton as actually consisting of four basins, the first three from northeast downward, known as the "Mill Creek" "Reservoir" and "San Bernardino" Basins. The city of Redlands overlies what are thus described as the "Mill Creek" and "Reservoir" Basins and a small part of what is thus described as the "San Bernardino" Basin. The fourth of these subdivisions is referred to as the "Lytle Basin." It consists of the watershed of the Lytle Creek, a tributary of the Santa Ana River coming in from the northwest and skirting the northeasterly edge of the Bunker Hill Dike to its outlet.

It is, with substantial correctness, said in the opening brief of counsel for the cities of Redlands, San Bernardino and Colton (pp. 6, 7) that:

"Because Bunker Hill Dike is, in large part, impervious, it holds back to a very considerable extent the water which accumulates in the subterranean area above it. But it is not a dam in the sense that it is completely watertight. Roughly speaking it is merely a rim to the basin which impedes the flow of underground water except at a gap in the vicinity of Colton. This gap was variously estimated to be from 6000 feet to five miles wide. Through this gap the water percolates southwesterly. . . ."

The city of San Bernardino overlies the "San Bernardino Basin," as above described, and if the nomenclature of the trial court and of the plaintiff are followed, then both it and

the city of Redlands lie within what the findings describe as the "Upper Basin."

Of the four more or less distinct areas or basins, thus included in the trial court's "Upper Basin," by far the largest and most important is the "San Bernardino Basin." It has a length of some 25 miles and a breadth of about 12 miles. It attains depths known to be in places more than 1200 feet. At some points its porous formations never have been plumbed. It has been well described, under the name "San Bernardino Artesian Basin," in the opinion of the Supreme Court in the case of *City of San Bernardino* v. *City of Riverside,* 186 Cal. 7, 11-12 [198 P. 784], in part as follows:

"The gradient of the surface of the basin from the foot of the mountains toward this" (the) "outlet varies from twenty-five to fifty feet per mile. Near the center there are level spaces which, prior to any artificial drainage, were swamps or marshes. It is probable that the basin was originally a lake and that its present condition is the result of the gradual filling of the bed in the course of ages by detritus washed down by the adjacent mountains. The material of the basin is composed of boulders, gravel, sand and soils of varying textures. As the lake-bed gradually filled, the torrents from the mountain canyons changed their courses from time to time, forming underground strata or waterways of coarser material in which the water percolates more freely than elsewhere. . . . The whole mass of underlying strata composing this basin is saturated with water. The upper stratum is soil of a closer texture than the strata beneath. This overlying cap confines the water to the porous strata below, and the gradient of these formations causes a hydrostatic pressure therein."

Not only is the San Bernardino Basin crossed by the Santa Ana River, but within its limits that stream is joined by several of its tributaries. One of its tributaries, however, known as "Warm Creek," which is forced to the surface by the hydrostatic pressure, already described, flows through the easterly part of the city of San Bernardino and thence follows a channel paralleling that of the river, through the gap in the Bunker Hill Dike, and joins the main stream just below.

The appellant city of Redlands obtains its municipal water supply from the basins which it overlies, the appellant city of San Bernardino from the "San Bernardino Basin," and the appellant city of Riverside, although lying outside the "San Bernardino Basin," and below what the findings describe as

the "Upper Basin," reaches upward to the "San Bernardino Basin" for a point of diversion for at least a part of its water supply.

The several subdivisions of the trial court's "Middle Basin," marked off from one another by various natural barriers, are distinguished in the brief of counsel for the defendant city of Riverside, for the most part concurred in by counsel for the other defendants, as follows: the more or less connected "Rialto" and "Colton" Basins, the "Riverside-Arlington" Basin, the "Chino" Basin and the "Temescal" Basin.

Of these the Rialto and Colton Basins are next downstream from the gap in the Bunker Hill Dike. They are supplied by the flows of the river and Warm Creek, and the seepage under their beds from the San Bernardino Basin and also by water diversions from the Lytle Creek Basin, and probably, as may be gathered from the map, plaintiff's Exhibit I, by some seepage of the waters of Lytle Creek through the Bunker Hill Dike.

The city of Colton overlies the "Colton" Basin and derives its water therefrom and from the Lytle Creek diversion above referred to.

The "Rialto" and "Colton" Basins result from an underground dike or dam below them known as the "Rialto Fault."

The next lower, "Riverside-Arlington" Basin, which has, at points, a depth of as much as 500 feet, is confined at its lower end by this so-called "Riverside Narrows," the rocky barriers of which rise on either side of the river at a stretch in its course approximately where it leaves the limits of the city of Riverside.

This basin is supplied by the overflow from the Rialto and Colton Basins.

After passing through the Riverside Narrows, the Santa Ana River proceeds downward until it reaches the flood control reservoir which is confined by the structure; built in 1941 by Army engineers, known as the "Prado Dam." This structure is impervious down to bed rock and impounds all water reaching it which is not released from it.

Northwest of the city of Riverside and of the "Riverside-Arlington" Basin is a series of heights known as the Jurupa Mountains, and to the north and northwest of these is the large "Chino" Basin. This is fed by the waters of San Antonio and Cucamonga Creeks, both of which originate well to the west of the San Bernardino area in the San Gabriel Mountains, and the waters of which, insofar as they are sup-

plied by these creeks, constitute a contribution to those of the river entirely distinct and separate from any of those that we have hitherto considered. The respondent, however, contended in the trial court that there also percolate or percolated under natural conditions, into this "Chino" Basin through gaps in the formation constituting the Jurupa Mountains, and north of them, considerable quantities of water from the San Bernardino and Colton-Riverside areas ("Rialto," "Colton" and "Riverside-Arlington" Basins). The appellants dispute the fact of such percolation, but the trial court found that it occurs and in the face of a conflict of evidence on the subject we are bound by its finding. The matter is of some importance for if there were no such percolation it would follow that no contribution to the waters of the river from the Chino Basin would suffer diminution from the appellants' diversions.

Bordering the left bank of the river, below Riverside Narrows but above the Prado Dam is the small "Temescal" Basin, fed by the Temescal Creek coming from the region of Lake Elsinore. This basin, except for such seepage, if any, as it may receive from the Santa Ana River, is unconnected in the source of its waters, with any other.

All of the basins above referred to and forming part of the trial court's "Upper" and "Middle" basins, in addition to such flows or seepage as they get from the Santa Ana River or areas above them, receive also whatever accessions to their waters result from rainfall on their respective surfaces or return flows from irrigation or sewage effluents from cities within or above their limits.

From the point where it leaves the Prado Dam the river enters a canyon through which, with relatively little loss from seepage, it penetrates the Santa Ana Mountains and emerges into the broad plain of Orange County where, except to the extent that it is interrupted by diversions, largely as a stream sunken in the dry season beneath the sand, it pursues its way to tidewater. In the stretches below the Prado Dam its course is through what the trial court has designated as the "Lower" Basin, which, so far as it consists of arable land, is identical with what the appellants describe as the "Santa Ana" or "District" Basin, so called because the territory of respondent district occupies it and extends to an area somewhat exceeding it.

Appellant cities, both in every stage of the proceedings in the trial court and in many pages of their briefs and in their

oral arguments at the hearing in this court, have attacked the complaint as failing to state a cause of action. In this connection we have to consider the character of the district as a public corporation, the general authority given it by subdivision 2 of section 2, of the statute under which it exists, to sue and be sued (Stats. 1953, ch. 770, pp. 2035, § 2, subd. 2, p. 2050), and the special provisions of subdivision 7 of said section 2, quoted at the outset of this opinion, in connection with sections 367, 369 and 382 of the Code of Civil Procedure.

There can be no question that any owner, within the district, of an individual water right, whether riparian, overlying or appropriative, may maintain an action to quiet his title to it as against any adverse claimant or to protect it by obtaining declaratory or injunctive relief against unlawful infringement of it. Appellant cities, however, complain that the district, claiming for itself no proprietary interest in any water right, is here seeking to represent all water rights, riparian, overlying or appropriative of all of its cities, inhabitants and all landowners within its boundaries, without pleading their nature or extent, or setting out any basis for a finding that they constitute any legally recognizable class, which may properly form the subject of such representation. In proceeding to examine these contentions we have first to consider with some particularity, what, so far as pertains to these objections, the complaint does and what it does not contain. The corporate organization and existence of the respondent district and appellant cities is duly alleged.

Section III of the complaint *inter alia* states the area within the boundaries of the district to be "approximately 170,000 acres."

Section IV described the topography of the Santa Ana River system and its general physical characteristics.

Section V is as follows: "All of the lands within the District are fertile and tillable and are valuable and especially adaptable to the raising and cultivation of avocadoes, grapes, berries, oranges, lemons and other citrus and deciduous fruit trees, alfalfa, beans and other farm products. To grow and produce such fruit trees and other crops thereon, water for domestic use and irrigation is necessary and indispensable, and without such water no fruit trees or other crops can be grown thereon, and said lands would be of little value. Said lands are also valuable for the raising and grazing of livestock, and for residential purposes, and water is necessary for

the watering of livestock and for domestic use and for the irrigating of lawns and flowers and vegetable life necessary for such purposes. Large areas of said lands heretofore have been and now are planted with fruit trees which are under cultivation and in full bearing, and large areas of said lands have been and now are raising large quantities of vegetables, sugar beets, beans and other crops annually planted. All of said lands devoted to such trees and crops have been and are dependent upon irrigation, in order to produce such fruit and crops. There have been and are erected houses on said lands which have heretofore been and now are occupied for residential purposes, and without the use of said water said trees and crops on said lands would die, and the houses erected thereon would be uninhabitable, and said lands would be of no value for the purposes aforesaid.''

Section VI is as follows: ''There lies and exists within the District an artesian or underground-water basin (hereinafter called the 'District Basin') sloping generally from the mountains to the sea, and embracing an area of about 120,000 acres. The surface lands in said Basin are underlaid at a depth varying from a few feet to about 2,000 feet, with an alluvial deposit composed of boulders, gravel, clay, sand, silt and other fluvial and detrital materials of varying textures, all of which alluvial materials have been laid down in the form of lenses, lozenges, kidneys and strata by said Santa Ana River and its tributaries, and which in a state of nature are saturated with water and through which percolates a continuous body of underground waters, practically all of said waters being supplied by said Santa Ana River.''

Section VII sets up the dependence of the district, its lands and inhabitants on the flow of the river for recharging the strata underlying what this complaint itself calls the ''District'' Basin, as constituting the main source for water replenishment for the basin and providing the principal water supply to most of the inhabitants of the district.

Section VIII reads: ''The greater portion of the lands within the District overlie the water-bearing strata and continuous body of percolating waters in said District Basin, and the remainder of said lands are irrigated from wells sunk into said water-bearing strata and continuous body of percolating waters in said Basin, and said strata and body of percolating waters are naturally and constantly supplied by the waters from the natural, ordinary and usual flow of said

Santa Ana River, and its tributaries, sinking in and percolating through said underground strata, as above alleged."

Section IX describes in general terms the methods used by land owners within the district to avail themselves of its water supply, alleges that within the last 50 years over 4,500 producing wells have been sunk therein "to a depth sufficient to contact and penetrate the underground strata of water bearing gravel and sand which underlie said lands and are common to said basin"; that such wells are in operation and provided with pumps and other machinery and equipment, and that in development of the water supply the expenditure within the district has exceeded $25,000,000.

Section X enlarges upon the inadequacy of the Santa Ana River and its waters to replenish the water supply of the "District" Basin, and states that the water table therein has for many years been receding; alleges that the overdraft upon it exceeds 12,000 acre feet annually and would be greater had not the cities of Santa Ana, Anaheim and Fullerton and the district itself obtained additional water from the Colorado River (setting out the quantities of water imported by each) and alleges that but for such importations the overdraft would exceed 20,000 acre feet per annum.

Section XI is as follows: "The subject matter and questions involved in this action are of common and general interest to the many owners of land within the District and bordering upon and riparian to said Santa Ana River and to the many owners of land overlying, and the users of water in said District Basin, and to the inhabitants of the District. Said riparian and other landowners and water users and inhabitants are too numerous and it is impossible and impracticable to bring them all before this Court in this action. By reason thereof and by reason of the powers granted to and vested in the District by said "Orange County Water District Act," this action is brought, maintained and prosecuted for the benefit of the District and also of all riparian and other landowners, water users and inhabitants within the District, and having a common and like need of the waters as above alleged, and for the common object and purpose aforesaid."

It is true, as counsel for the appellant cities assert, that no attempt has been made to plead specifically the water right of a single one of the water users whom respondent district claims to represent, nor as to such riparian or overlying rights that any of them may have, to describe any of the particular

tracts or parcels of land in which such rights inhere, nor to state the quantities of water required for reasonable use on any of such tracts, nor how much of the same is being actually used, nor to set out the extent of any appropriative rights of the cities or any other water users within the district, nor to set out any data from which it can be determined to what quantities of water such appropriative rights have matured into prescriptive rights, nor are there any allegations with respect to the dates when such several appropriative rights accrued, as a basis for adjudging how far, if at all, they may have priority over such prescriptive rights to take water from the river system, as the appellants or any of them may possess. Indeed there is not in the complaint any statement as to how much water, whether in acre feet or other units of measurement, is required to satisfy overall requirements of the water users within respondent district. What is stated with respect to the aggregate requirements of the agencies and individuals sought to be represented by the respondent district is simply that the replenishment of the annual supply falls short by amounts which are stated, of meeting their annual drafts upon it, even when the supply is augmented by the importation in stated amounts of Colorado River water.

The first question, therefore, which we have to determine, is whether the complaint as thus summarized should be held to state a cause of action. While the situation is arguable, we believe that it does. If, as does appear from the complaint, the ''District'' Basin, that is that portion of the area of the district alleged to be underlain by water. fed by the river system, amounts to as much as 120,000 acres, it is manifest that, initially, the whole of that acreage was invested with overlying rights to the use of such water, and that such rights, inhering in the several tracts that made up the area, were correlative with each other (*Katz* v. *Walkinshaw,* 141 Cal. 116 [70 P. 663, 74 P. 766, 99 Am.St.Rep. 35, 64 L.R.A. 236].) None of such rights were lost by mere nonuser. If any have been lost or curtailed it has either been in consequence of voluntary surrender of them or some part of them by their owners, for a consideration or otherwise, to the needs of some appropriator, or by condemnation, or else by the ripening through prescription of appropriations into prescriptive rights adverse to them. Insofar as such overlying correlative rights have not been lost either in one or the other of these three ways they are manifestly still in existence and included in the water rights which the respondent district

seeks by this action to protect, and are prior and paramount to any appropriative claims of appellant cities that have not ripened into prescriptive rights. To be sure riparian and doubtless, for that matter, overlying rights also, are divested by severance as to that part of any tract which, by conveyance, condemnation or otherwise is severed from areas formerly a part of it which retain contact with the stream or underground basin. But, if the allegations of the complaint are true that 120,000 acres within the district do presently overlie the "District" Basin, then it follows that no part of that 120,000 acres has lost contact with the water supply or lost its overlying right through mere severance. A scrutiny of the complaint discloses nothing from which it can be elicited that any part of the 120,000 acres referred to, have lost their overlying rights by conveyances, condemnation or by reason of infringement thereon by appropriators within the district, and to require the district to negative in its complaint the loss of any overlying rights by reason of conveyances, condemnation or such conflicting appropriations would be to require it to plead a negative which is not ordinarily required (*Farr* v. *Bramblett,* 132 Cal.App.2d 36, 48 [281 P.2d 372].)

To be sure the complaint does disclose the existence within the district of irrigation districts, some of which may be, but need not necessarily be, exercising appropriative rights, and also of the cities of Santa Ana, Fullerton, Anaheim and Huntington Beach, and we may take judicial notice that there are other such communities, which draw water from the District Basin, all of which may be assumed for the sake of the argument and doubtless are in fact, in greater or less degree appropriators therefrom, but it does not appear from the complaint nor can it be elicited therefrom that any appropriations on their part have in fact excluded any acreage that overlies the water bearing basin from contact with its waters or from participation in their use, though it may be elicited from what the complaint sets out that appropriations on the part of such agencies, in addition to those of appellant cities and withdrawals by other water users in areas above the "District" Basin, have resulted in diminishing the available water supply.

It seems to us, then, that the allegations of the complaint amount to an assertion that there are not less than 120,000 acres of land within the district possessing overlying rights in this subterranean water fed by the river. Neglecting, then,

for the moment, any claim of the district to represent any appropriative rights of water users within its limits, and looking to the allegations of the complaint alone, we believe it sufficient to assert affirmative rights on the part of the overlying lands and their owners and the water users exercising such rights to participate in the underlying water supply sufficient to entitle their rights to protection against any infringement by others having inferior rights. Even if the allegations of the complaint could be read as conceding that, as to any tract or tracts overlying the "District" Basin the overlying rights had been extinguished in either of the ways above mentioned, yet if the complaint could be, as it must be, so read as to assert that any part of the overlying land still retains such rights, in any degree, an action would still lie to protect them.

All in all, while it must be admitted that in its description of the rights which it seeks to protect the complaint is at best sketchy, and might even be called cryptic, we are unable to say that it is not in that respect legally sufficient.

■ We have now to notice a contention particularly insisted on in the briefs of counsel for the cities of San Bernardino, Colton and Redlands. It is asserted (closing brief pp. 43-45) that, if the act under which this district exists, is construed as authorizing it to represent the rights of those whom it here undertakes to represent, by asserting them in such general terms as are contained in the complaint, then the act must be held to violate article XIV of the amendments to the Constitution of the United States as authorizing the taking of property of appellant cities without due process of law. In that connection counsel say that the "judgment in favor of the District is based upon a complaint which makes no claim that either the respondent or those it assertedly represents, have any right to water which is superior to that of any one of the cities." Then counsel assert that "the evidence does not show any right superior to that of any of the appellants." But we have not yet come to the consideration of the evidence and will discuss that when we reach it. What we are presently discussing is the sufficiency of the complaint to show that the respondent is entitled to maintain the action. It certainly asserts—whether with desirable particularity or not, it does assert—overlying water rights in the District Basin in behalf of property owners within its borders, which, if they exist, are the analogues of riparian rights on a stream and as such entitled to protection against all interference

by upstream appropriators except those whose interference is rightful. Respondent district does not claim such protection against the taking by appellant cities of water within the limits of their prescriptive rights. What property of appellant cities can it then be claimed that in violation of the Constitution respondent is seeking to take? Counsel's answer will be found on page 105 et seq. of the brief last referred to under the heading "A municipality has the right to extract from an underlying basin, and to distribute to its inhabitants all of the water which can be beneficially used by such inhabitants upon lands which are within the city and which overlie the basin." The argument is that the individual inhabitants of a city overlying such a basin have been recognized in such cases as *City of San Bernardino* v. *Riverside,* 186 Cal. 7 [198 P. 784], and *Eden Township County Water District* v. *City of Hayward,* 218 Cal. 634 [24 P.2d 492], as having, with respect to the basin over which they live, correlative or overlying rights substantially the same as those of riparian owners on a stream, for which, as individuals, they may undoubtedly invoke the protection of the courts, and that it is logical that the municipal corporations, as the administrators of the water systems which such individuals must use, should be allowed to pool their interests and represent them in protecting these rights. This court, then, is asked to break new ground by recognizing in municipal corporations the authority to thus represent the collective individual overlying rights of their inhabitants. This action we are asked to take by proceeding after the analogy of the action of the Supreme Court in *Katz* v. *Walkinshaw, supra,* which brushed aside the common-law doctrine, *Cujus est solum ejus est usque ad coelum et ad inferos,* and inaugurated the opposite doctrine of correlative rights. Whatever persuasiveness this argument may have, however, it is not properly addressed to this tribunal. It was squarely decided in *City of San Bernardino* v. *City of Riverside, supra,* that municipalities, in the absence of some statute authorizing them to do so, are without authority to represent the individual water rights of their inhabitants, but themselves in taking water from an underground basin are appropriators only and as such that their rights are strictly measured by the law governing appropriators. This being the legal situation, this court, as an intermediate court, can only deal with it as it is. It is not for us to inquire what the law ought to be when the Supreme Court has emphatically informed us what

the law is. Counsel's suggestion, therefore, cannot be addressed with propriety to any court subordinate to the Supreme Court.

■ As an alternative, however, to the contention thus disposed of, it is claimed that if the cities must be treated as appropriators they are here, in violation of the constitutional provisions referred to, being deprived of property. This property, it is said, is their *inchoate* right to take water from a stream or basin in excess of what their prescriptive rights entitle them to, by reason of their having started to take such excess water. Clearly, however, as against riparian users on a stream or the owners of land overlying a basin or even as against appropriators having valid prescriptive claims to such water, they have no such "inchoate" rights. To the extent that, in excess of their prescriptive use, they are taking anything but surplus water they are merely trespassers (*Anaheim Union Water Co.* v. *Fuller*, 150 Cal. 327, 334-335 [88 P. 978, 11 L.R.A. N.S. 1062] ; *Fall River Valley Irr. Dist.* v. *Mt. Shasta Power Corp.*, 202 Cal. 56, 70 [259 P. 444, 56 A.L.R. 264] ; *City of Pasadena* v. *City of Alhambra*, 33 Cal.2d 908, 926-927 [207 P.2d 17].) Not even a permit from the state to appropriate a given quantity of water can convert the taking of such nonsurplus water from a trespass into an "inchoate" right to the prejudice of users having superior rights (*Fall River Valley Irr. Dist.* v. *Mt. Shasta Power Corp.*, *supra*, 202 Cal. 56, 67-69.) ■ These principles have not been in any wise nullified by the amendment in 1928 to article XIV of the state Constitution, restricting riparian rights to the reasonable requirement for their beneficial use of the waters of streams. Undoubtedly this amendment will in many cases properly result in the classification as "surplus" of more water than would previously have been so classified, but in no way enlarges the right of appropriators to take water which is not surplus and it still leaves to the courts the function of determining whether or not in given cases there is any surplus.

■ The appellants claim, also, that the necessary averments to bring the case within the provisions of section 1060 of the Code of Civil Procedure authorizing action for declaratory relief are insufficiently pleaded, in that it does not sufficiently appear that there is an "actual controversy between the respondent and appellants relating to the legal rights and duties of the respective parties" (citing *Ephraim* v. *Metro-*

*politan Trust Co.*, 28 Cal.2d 824, 836 [172 P.2d 501], to the effect that it is insufficient for a complaint to assert that such a controversy exists but it must appear that defendant's position is in opposition to that of the plaintiff). It is claimed that the "controversy," if any here, is between the respondent's water users and the appellants, not between the respondent and the appellants. The objection is overtechnical. If respondent is entitled to represent its water users, or any of them, then in legal effect any controversy over their respective water rights between the water users represented and the appellants is a "controversy" between the respondent District and the appellants.

That the district is empowered to represent the rights of its overlying water users does not, we think, admit of a doubt. It is true that under section 367 of the Code of Civil Procedure: "Every action must be prosecuted in the name of the real party in interest, except as provided in section three hundred and sixty nine of this code."

Section 369 authorizes such prosecution by one "expressly" authorized by statute, without joining with him the persons for whose benefit the action is prosecuted and it must be deemed settled that the authority to commence, maintain, intervene in, defend and compromise "in the name of the District and otherwise," actions and proceedings of the character contemplated in subdivision 7 of section 2, which we have quoted, of the act under which the district exists, as amended, is "express" authority within the meaning of said section 369 of the Code of Civil Procedure (*Coachella Valley County Water Dist.* v. *Stevens*, 206 Cal. 400 [274 P. 538].) This Coachella case was brought under the provisions of what was known as the County Water District Act by a district formed thereunder, to protect the interests of the water users, both riparian and appropriative, taking their supply from a basin backed up by a natural dam in a stream known as the Whitewater River, against what were alleged to be unreasonable drafts, actual and threatened by an upstream riparian owner whereby it was claimed that the district water users were being and would be damaged. There, as here, what was sought was declaratory and injunctive relief. There, as here, the plaintiff district relied on statutory authority to maintain the suit in its own name without joining its water users as parties plaintiff or at all. There, also, its complaint omitted any specific description of their lands or individual rights

though it did contain allegations as to the extent of the aggregate requirements of the plaintiff's water users and as to what the extent of reasonable use by the defendants was. A demurrer was interposed on the grounds (1) that the plaintiff had not the legal capacity to sue; (2) that the complaint fails to state a cause of action; and (3) that there was a defect or misjoinder of parties plaintiff. The trial court sustained the demurrer and rendered judgment for the defendants. This was reversed by the Supreme Court on appeal. That court dismissed the contention that no cause of action was stated in the complaint with the curt comment that (pp. 405-406) "it is clear that sufficient has been set forth to constitute a cause of action. The second ground of objection to the complaint is therefore found to be without merit."

█ It is true that a plaintiff must succeed, if at all, on the strength of the title on which he sues, and not in consequence merely of a weakness in the title of a defendant, but if we are right in believing that the complaint does, though in general terms, set out the existence of overlying rights on the part of those or any of those whom the district assumes to represent, then to that extent a "title" has been alleged as a basis for an action to protect it. Doubtless if the suit were one by an individual for protection of rights inhering in any particular parcel of land or to quiet title to such rights, greater particularity would be required, but the object of the present action is not to quiet title as to any individual property but includes, at least, the protection of the rights of all overlying agricultural lands and land owners, to the extent that such rights have not been divested, within the whole district, and it is manifestly true that to plead them otherwise than in general terms, or protect them by individual provisions in a judgment would be difficult and possibly impracticable. We do not see why the owners of such overlying rights may not properly be treated as a class possessing such common interests as to justify the maintenance of a single action for their protection. Whether or not the overlying landowners using water for other purposes than agriculture or the holders of appropriative rights within the district are properly to be included within the same class is another question but not a question that goes to the right of the district to maintain the action at all.

We note, however, that the Coachella case makes no distinction between holders of riparian and appropriative rights

within the district, as respects the authority of the district to represent them.

The power of the state or its duly authorized public agencies to undertake the representation in the courts of interests common to great numbers of its inhabitants, though the particular character and extent of their water rights may greatly differ as between themselves, is generally recognized. An apt illustration is readily at hand. The flow of the Colorado River, actual and potential, has been allocated by interstate agreement between what are known as the states of the "Upper" and the "Lower" Basins. As between the states of Arizona and California, however, which participate in the allocation to the Lower Basin, there has been no final allocation and the quota to which each is entitled, as against the other, is at this moment a subject of litigation in the Supreme Court of the United States. It is certain, however, that the flow of the river will not suffice for the full needs of both or for that matter of either. Section 102 of the state Water Code provides:

*"State Ownership of Water; Right to Use.* All water within the State is the property of the people of the State, but the right to the use of water may be acquired by appropriation in the manner provided by law."

Let us for the sake of illustration assume, however (in the circumstances not an unreasonable assumption), that every drop of the river flow which can possibly be allocated to California, has already passed by appropriation, recognized under state law as valid, to corporations, public or private, and to individuals within the state, so that the state, as such, has no longer any proprietary right in a drop of the flow. Has anyone contended that the state has thereby forfeited the right to represent its citizens before the federal courts to establish what may be found to be the aggregate of their rights? Or will anyone assert that, as a condition to establishing their rights, the State of California must plead or prove the extent and validity of each individual appropriation or water right, as such, even though it may be, as a matter of precaution, doing it? The answer to both questions is, of course, no. It is enough, for that purpose, if it appear that the aggregate of their rights is sufficient to be in danger from the claims asserted by Arizona in behalf of its inhabitants, and to require protection to the full extent that does not infringe

on what may be found to be the aggregate rights of the inhabitants and lands of Arizona.

The defendant city of Riverside asserts that the language of subdivision 7 of section 2 of the act under which the district exists is insufficient to authorize the maintenance of this action in that, although it authorizes the district to represent its water users in actions or proceedings "to prevent interference with water used or useful to lands within said district or diminution of the quantity . . . of the water supply of said district . . . ," it omits any such language as was contained in the 1923 amendment to the act involved in the Coachella case in terms authorizing that district to oppose "diminution of the natural flow of any stream or natural subterranean supply of water used or useful for any purpose of the District or of common benefit to the lands within the district or its inhabitants . . ." and counsel urge that the water supply which plaintiff district is authorized to protect is only such water supply as may be owned by the district as distinguished from the "natural flow of any stream" of common benefit to any land within the District or of its inhabitants, and, in that connection, reference is made to the title of the Orange County Water District Act (Stats. 1933, ch. 924, p. 2400) which is claimed not to be sufficiently broad to authorize the district to protect the private rights of water users in the river system and the "District" Basin. We think it sufficiently evident, however, from the title itself of the Orange County Water District Act, that the overriding purpose of the act was to insure an adequate water supply for the whole area within the district and that everything else contained, either in the title or the body of the act, amounts merely to spelling out some of the means for accomplishing that result. Thus the powers given to import water into the district and to prevent waste of water therein or exportation of water therefrom and to provide for reclamation of drainage, flood and other water for beneficial use in the district and control of storm and flood water flowing into the district, are none of them expressed as being for any proprietary interest of the district, as a corporation, but are obviously intended to subserve the needs of all who are beneficially entitled to water within the district. So, although the district is, indeed, empowered in its corporate capacity, to construct works, acquire property, incur indebtedness and sue and be sued, to empower it to do all these things seems to us merely

to authorize these expedients as means that may be employed, where needful, to effect the essential purpose of the district, *i.e.,* to insure the water supply, not provisions designed to erect the district into the position of an exclusive purveyor of water.

■■ If this is, as we think it, the correct view, then the situation falls within the rule stated in this court's opinion in *Orange County Water Dist.* v. *Farnsworth,* 138 Cal.App.2d 518, 526 [292 P.2d 927], that "the title is sufficient if the provisions of the act are germane to the subject matter expressed in the title and if the title naturally suggests to the mind the field of legislation which is included in the text of the act," for, as further said in the opinion cited: "it was never intended that the title of the act should be an index to all of its provisions."

■ Accordingly, we see no discrepancy between the title of the act and the provisions of section 2, subdivision 7 of the act, as amended, when the latter is interpreted as sufficient to authorize the present action, and, as the opinion just cited also points out, it is settled that "reference in the title of an amendatory act to the title of the statute amended is sufficient if the subject matter of the amendatory act falls within the subject expressed in the title of the original statute."

■ Counsel for the cities of San Bernardino, Colton and Redlands further object to the maintenance of this action by the District in behalf of its water users generally, urging that a question is not one of "common" or "general" interest within the meaning of section 382 of the Code of Civil Procedure defining the conditions under which one or more parties may sue or defend for a group unless the members of the group "are so united in interest with the person who brings the action or defends against it, as to make them *necessary* parties under the first sentence of the section," there referred to as "those who are united in interest." (Citing *Carey* v. *Brown,* 58 Cal. 180, 183-184.) It is urged that to justify a representative suit the minimum requirements are that "(1) There must exist a well defined community of interest in questions of law and fact between those bringing the suit and those claiming to be represented; and (2) That the suing and non-suing group must constitute a definite ascertainable class. If the rights of each member of the class are dependent upon facts applicable only to him there is not this required ascertainable class required for a representative suit." (Quoting *Barber* v. *California Employment Stabilization Com.,* 130

Cal.App.2d 7, 14 [278 P.2d 762]. Citing *Weaver* v. *Pasadena Tournament of Roses Assn.*, 32 Cal.2d 833 [198 P.2d 514].) It should be noted, however, that in the Weaver case it was said (p. 841) that "it cannot be said that a 'representative suit is warranted only in those cases where the represented group is so united in interest with the actual plaintiff in the action as to make them necessary parties under the statute.'" (Referring to § 382.)

It must be observed, moreover, that the present action is not, strictly speaking, prosecuted under the provisions of section 382 of the Code of Civil Procedure, but, in conformity with section 369 of that code, under the special statute giving the District the power to maintain actions "to prevent interference with water or water rights used or useful to lands within the District." In *Coachella Valley County Water Dist.* v. *Stevens*, 206 Cal. 400, 410, *supra*, the court noted *arguendo* that the defendant there *properly* conceded that an action would under section 382 have lain "on behalf of each landowner in the District to protect his individual right." And though it appeared that such rights were not identical but that some were riparian and others appropriative, the court went on to say that "it would necessarily follow that under section 382 of the Code of Civil Procedure one might sue for the benefit of all." But that did not mean that the right of the district to sue was dependent on that section, nor that the act there involved required, any more than does the act here involved require, that such landowners be joined as necessary parties. What the court did say was that:

"The fact that the district as such does not assert title in itself to any of such rights is of no consequence, if it has the power to proceed in a representative capacity to protect the rights of all of the land owners *and other users of water* in the District." (Italics ours.)

In fine we hold, then, both (1) that a cause of action has been stated and (2) that the plaintiff district has the necessary standing in court to maintain it.

As respects the question of parties, it follows from what has already been said that, though overlying land owners and others claiming water rights within the district might properly have been made parties plaintiff, it cannot be held that the district was required to join them as parties, nor that their absence amounts as a matter of law to a defect of parties plaintiff. Neither do we think that, for the purpose

of seeking a determination of the extent of the prescriptive rights of appellant cities themselves to produce appropriated water from the Santa Ana River System (as distinguished from their acquisition of water from nonmunicipal agencies themselves having prescriptive rights to the same) the district was required to join, as parties defendant, other appropriators of water from the river system upstream from the District Basin. If, as respondent asserts, appellants, even apart from such water as they may get from others, are tort feasors in themselves extracting from an overdrawn system more water than they have the prescriptive right to take, respondent would not be precluded from obtaining relief at law against them because it has not chosen to sue others who may also be tort feasors. (*Grundel* v. *Union Iron Works,* 127 Cal. 438, 440 [59 P. 826, 78 Am.St.Rep. 75, 47 L.R.A. 467] ; *Heath* v. *Manson,* 147 Cal. 694, 701 [82 P. 331].) ▮▮▮ The rule in equity is that when a decree may be made without concluding in any way the rights of an interested person he is not a necessary, although he may be a proper party. (*Reed* v. *Wing,* 168 Cal. 706, 708 [144 P. 964], citing *Story* v. *Livingston,* 13 Pet. (U.S.) 359, 375 [10 L.Ed. 200] and *Lytle Creek Water Co.* v. *Perdew,* 65 Cal. 447, 455 [4 P. 426].) ▮▮▮ In the instant case it is manifest that if the evidence is found to sustain the allegations of the complaint some relief may be granted to the district without prejudice to the rights of others whom respondent has not seen fit to sue. Undoubtedly where adjudication is sought of rights to a stream the preferable course is, so far at least as is practicable, to "have all owners of lands on the watershed and all appropriators who use water from the stream . . . in court at the same time." (*California* v. *United States,* 235 F.2d 647, 663), and it would have been a proper exercise of the trial court's discretion had it acceded to appellants' motion to bring in at least the more important among the other appropriators of water from the river system. By resisting their joinder, however, respondent has not foreclosed itself from obtaining any relief, although, as will be hereinafter seen, it has limited the relief which it may seek.

Appellants claim that the evidence in many particulars fails to sustain the findings. In discussing these we shall generally but not always follow the order in which they appear in the record.

Findings I to IX, both inclusive, have to do with the organization and capacities of the several parties to the action;

with the area of the district, its boundaries and corporate powers including the power to maintain this action; with the common interests of the riparian landowners and the owners of lands overlying the district basin as well as other land owners and inhabitants of the district and the dependence of all of them on the Santa Ana River System for their water supply; with their number and the consequent impracticability of making them individually parties to the action; with the description of the river system including the Santa Ana River itself, its tributaries, the several basins involved; with a finding that all the waters of the river system "underground and surface alike are part of one interconnected common supply" and another finding that the whole constitutes essentially one watershed and one basin; with the geology of the area; with the character and fertility of the lands within the district and the extent and cost of their development and the fact that they would be of small value without water from the river system. Much of the matter in these nine findings is either admitted by appellants or subject to no real dispute. Some of what is found is more matter of law than of fact and has already been discussed in this opinion. The description of the topography of the region insofar as it appears in these first nine findings is not, in general, disputed, though some details such as the flow from the Colton area through or north of the Jurupa Mountains have, as we have noted, been a subject of conflicting evidence. Appellants view with some distrust the emphasis in the findings on the unity of the river system, taken as a whole. The findings on the subject are, in some sort, conclusions of facts, the facts from which they are drawn being clear enough. There can be no question of the existence of underground basins of large areas and considerable depth, in which water is relatively stationary, and in the lower levels of which, particularly in the San Bernardino Basin, it may not be in motion at all. These basins from that standpoint may be regarded as distinct geographical units. On the other hand, at least from their upper levels, the basins spill into each other and feed the general downward flow of the river. Whether, then, the river system is to be taken as a series of lakes or one single stream, is more a question of the use of terms and of emphasis in points of view than of any dispute over the essential facts.

Finding IX contains certain other matters, as to which the facts are not in dispute, namely that, so far as not supplied

from wells, of which all but 68 are sunk in the water bearing strata of the District Basin, the lands within the district receive their water supply "by way of surface diversion from the flow of the Santa Ana River." It is further found that:

"The two principal water companies making such surface diversions from the flow of the Santa Ana River are the Santa Ana Valley Irrigation Company and the Anaheim Union Water Company, both of which have been diverting water from the river for about three quarters of a century. The amounts of water so diverted by said companies have remained substantially the same over the years."

The testimony of A. F. Shroeder, president of the Santa Ana Valley Irrigation Company, is to the effect that his company supplies 14,422 acres of irrigated land all but 47 acres of which lie within the district, while Lawrence A. Peterson, Secretary-Manager of the Anaheim Union Water Company, testified that the latter company is serving about 12,000 acres, all except 160 acres within the district. The Santa Ana Valley Irrigation Company serves its stockholders only, at the rate of an acre for each share of stock, and the shares are made appurtenant to their lands. The Anaheim Union Water Company, with three exceptions, also serves its stockholders only, each of whom is entitled to a specified flow of water for each share owned, but, in this case, the right to water is in gross, *i.e.*, not made appurtenant to any particular tracts of land. The three cases where ownership of stock has not been required as a prerequisite to furnishing water are (1) the Bryant Bixby ranch, (2) the Yorba Irrigation Company, and (3) sundry users of small quantities of water taken under court decree.

Both the Santa Ana Valley Irrigation Company and the Anaheim Union Water Company divert at nearly the same point in the Santa Ana River Canyon, upstream from and outside the district, practically all the surface flow of the river during the irrigation season and carry the same in canals down into the district. During other parts of the year there is surface flow in excess of the diversion. Both companies also have certain wells, some of which, in case of the Santa Ana Valley Irrigation Company, are located in the canyon below its intake, where these waters are added to those in its canals. Other wells of this company are used to spread water to percolate into the sand and permeable formations of the area that it serves. Similar spreading of water is done by the Anaheim Union Water Company in its service area. The amounts of

water directly supplied by the Santa Ana Valley Irrigation Company for irrigation during each of the water years 1935-1936 to 1954-1955 are in evidence (Plaintiff's Exhibit 10). In the first of these years 17,473.07 acre feet were supplied and in the last 13,982.76 acre feet. In addition, according to witness Shroeder, this corporation each year spreads upon lands within it service area, to replenish the water table, about 1,200 acre feet. The tabulation, plaintiff's Exhibit 9, shows the total of diversions from the river by the Anaheim Union Water Company at its headgate, for the water years 1940-1941 to 1954-1955, both inclusive. These diversions for the first of these years amounted to 14,742.10 acre feet and for the last 16,507.7 acre feet. These tabulations contradict, insofar as this company is concerned, that part of the above-quoted finding which asserts that the diversions of these two companies "have remained substantially the same over the years." On the contrary, it appears, for example, that the Anaheim Union Water Company in 1947-1948, took 20,610.04 acre feet, in 1949-1950 30,821.30 acre feet, in 1950-1951 25,213.90 acre feet, and in 1951-1952 23,010.10 acre feet. The contradiction, however, is not very material as the tabulation shows that in years subsequent to 1951-1952 the amounts taken by this corporation have been reduced to more nearly the figures of 1940-1941. The tabulations last referred to give the gross figures for the diversions. They include water spread upon the service areas to raise the water table, but the figures for the amounts spread are available only for the water year 1950-1951 and thereafter. In 1950-1951, the amount so spread by this company was 5,983 acre feet and for 1954-1955 6,286.5 acre feet. As respects the Anaheim Union Water Company the figures given for diversion are, of course, exclusive of any additional water furnished by its wells as to which no figures are furnished. Neither are there any figures, as to the amount of water diverted or produced by this corporation that is specifically devoted to irrigation, but it is manifest that most of the water diverted is so used.

We are now brought to the point, in our examination of the findings, of inquiring whether they disclose, and are supported by the evidence in disclosing, any such affirmative rights in those or any of those whom the respondent district undertakes to represent as to afford a basis for complaint of their infringement. For unless such rights affirmatively ap-

pear, respondent has made out no case and our inquiry need go no further. Finding X asserts that:

"As of 1955, the latest year for which figures were available at the time of trial, the total crop acreage within the boundaries of the plaintiff District was 109,452 acres. Said acreage had total irrigation requirements (in addition to normal supplies of rainfall upon said lands) of 154,148 acre feet of water per year. Of said lands, 90,115 acres thereof overlie the District Basin and in 1955 had total irrigation requirements of 126,617 acre feet of water per year."

Does this evidence support this finding?

In their closing brief (p. 45 et seq.) counsel for the cities of San Bernardino, Colton and Redlands assert with substantial correctness, that the evidence on which respondent must rely for support to this finding is the following: (1) The tabulation, Exhibit 4; (2) the tabulations, Exhibits 5A and 5B; (3) the aerial map, Exhibit 90; (4) "Certain exhibits showing the amounts of water supplied by various cities in Orange County situated within the District . . ." (Exhibits 22, 25, 26, 27, 28, 30, 68); and (5) a map "showing the location of active wells within the district, as of May, 1956, and testimony that during the fiscal year ending in 1955, 141,000 acre feet of water had been produced from them." This map is the plaintiff's Exhibit 116 and is accompanied by a tabulation, Exhibit 117, which we shall hereinafter discuss. These various exhibits were, however, of course, accompanied by testimony of witnesses respecting their preparation and the data that went into them.

In their brief, counsel for respondent district say: "The District's showing with respect to overlying lands made it unnecessary for the District to press or the trial court to determine the rights of the District's own cities of Santa Ana, Anaheim, Fullerton, and others, or the rights of other water users in the District who have riparian, prescriptive or appropriative rights. However, the factual data, e.g., water production records, etc. necessary for such determination are in the record for the cities and major water users within the District."

In this connection the trial judge said in his opinion: "The plaintiff district is bringing this suit in behalf of all users of water and inhabitants of the District. There has never been any mistake about that in my mind throughout

the trial, although even at the end some of the defense counsel, if not all of them, seemed to consider that plaintiff was suing only in behalf of the overlying landowners. What the plaintiff's counsel said throughout the trial was that they were going to depend on their proof of the need for water and the right to said water by the overlying land owners only and the damage to these overlying land owners caused by the overproduction of defendant cities to justify the relief asked for. But to whatever extent that might benefit appropriators, prescriptive users and other inhabitants of the District, this suit was being prosecuted for them also.''

The tabulation, Exhibit 4, purports to show the annual water requirements per acre of the various types of crops raised within the district, measured in acre feet. It was made by one Harold E. Wahlberg, a former director of the University of California Extension Service in Orange County, who testified during the earlier part of the trial, qualified as an expert on the water requirements of such crops, identified the exhibit as his work, and was duly examined and cross-examined on the subject. The exhibit is properly in evidence for whatever weight it may have.

Exhibits 5A and 5B are tabulations produced, while on the stand by Dixon W. Tubbs, Agricultural Commissioner of Orange County. His testimony appears at great length in the record (pp. 4433 to 4570 of the reporter's transcript). According to him, an annual crop survey of the county is made to enable him to make certain reports required by law to the state. For that purpose the county is divided into districts in each of which an inspector keeps track of the acreage planted and the crops of each class produced during a calendar year. These figures are turned in to the witness's office and are tabulated by his deputies, all under witness's direction. This system is used for all crops except citrus fruits, as to which the figures are obtained from the manager, of cooperative marketing organizations or packing houses within the inspector's district. The Exhibit 5A relates to the year 1954 and 5B to 1955. Page 2 of each of these tabulations contains four columns of figures, the first giving the estimate made of the whole acreage within the district devoted, in the year involved, to each of the various classes of crops; the second column giving the acreage of such land *overlying the District Basin,* devoted in the year involved to each type of crop; the third column giving the annual water

requirement per acre for each type of crop, expressed in acre feet, and the fourth column computed from the second and third setting out the total water requirements of the acreage of land overlying the District Basin devoted during the year to each type of crop. The grand total *i.e.*, the sum of the figures in the fourth column as shown in Exhibit 5A for 1954, is 144,146.95 acre feet and in Exhibit 5B for 1955 is 126,617.18 acre feet, the diminution in 1955 as compared with 1954 being due, according to the testimony, to withdrawal of land from agriculture for devotion to other uses. Columns 1, 2 and 4 of each of these two exhibits represent work done by witness Tubbs or under his direction. Column 3 in each exhibit is copied from Exhibit 4, which, as has just been seen, is the work of the witness Wahlberg.

We do not think that, in the circumstances recited, the items Exhibits 4, 5A and 5B or any of them are amenable to the objections of being hearsay. To the extent that any of them represent opinions they are the opinions of experts the weight of which is for the trial court. The Exhibit 5B forms the basis of the trial court's figures of 126,617 acre feet as the aggregate 1955 requirement for agricultural purposes alone of lands overlying the District Basin.

Appellants' counsel complain of the admission over their objections of the aerial map, Exhibit 90, and of the denial by the trial court of repeated motions on their part to strike the same from the record. This exhibit was mainly prepared by one Lawrence W. Stumph, Jr., a member of the organization known as Pacific Air Industries, the business of which is aerial mapping, and who testified in respect to the circumstances of its preparation. According to his testimony he has had considerable experience both in photography from the air, in the laboratory work necessary to produce such maps, and their interpretation. He has often flown over Orange County and says he knows it well. His organization made flights over the county during the three days of August 18, 19 and 20, 1955, and from photographs then taken this map was compiled. On it certain areas are colored green to represent land devoted to agriculture. The witness did not place the green color on the map but, according to his testimony, knows generally that the coloring is correctly placed. His experience, moreover, in interpreting aerial maps, in determining whether, on areas depicted thereon, crops, orchards

and uses of land generally are represented, enables him, he says, to corroborate the correctness of the green coloring. He does not claim to have visited every particular acre of the county or to have independent knowledge of the uses to which every particular area is devoted, and on cross-examination he concedes that inspection of the map indicates that some particular areas colored green thereon were not, when the photographs were taken, actually in crops; also that there are instances in which the map does not so clearly show what a particular tract is devoted to as to enable him to be certain on the point. The witness testified that he treats as agricultural land not only what is at a given time actually planted to a crop but also what is susceptible of being so planted.

We see nothing seriously prejudicial in the admission of this aerial map for whatever it is worth. Whatever evidentiary value it has was purely cumulative, as tending to some extent to corroborate the data in Exhibit 5B as to the area within the district of agricultural land overlying the District Basin. Nobody claims that every acre or tract included in what is colored green was or is in fact agricultural land nor is there any indication that the trial court was led to so believe. No jury was present to be confused by the map. The back and forth about it between counsel and the court, filling many pages of the record, make it clear that the court was fully apprised of the limitation upon its evidentiary usefulness.

We come next to the exhibits above referred to, having to do with the amounts of water supplied either from wells or by importations from the Colorado River for use by cities or other agencies for use within the district otherwise than upon agricultural lands. We have examined each of these exhibits. Exhibit 22 has to do with the ground water production and Colorado River water importations, when such importations occurred, separately stated, beginning with October 1 of each year and extending to September 30 of the following year, for the city of Anaheim for the period beginning October 1, 1931, and ending with September 30, 1955; Exhibit 25 contains similar data for the city of Santa Ana for the period October 1, 1934, to September 30, 1955; Exhibit 26 similar data for the city of Orange for the period October 1, 1940, to September 30, 1955; Exhibit 27 similar data for the Orange County Water Works District Number 3 (located in the unincorporated Garden Grove area) for the

period October 1, 1946, to September 30, 1955; Exhibit 28 similar data for the city of Fullerton for the period October 1, 1931, to September 30, 1955; Exhibit 30 data for water distributed in the city of Huntington Beach by the Southern California Water Company, a public utility, for the period October 1, 1940, to September 30, 1955; and Exhibit 68 similar data to that furnished for the above named cities for the city of Newport Beach for the period October, 1946, to September 30, 1955.

It is insisted that "these exhibits neither proved, nor tended to prove a water right in any person or organization superior to the rights of appellants." Most of them show increasing use of water from year to year. Taken together they do indicate a need in the urban areas of the district for an increased water supply. In sundry instances they indicate that the cities or other agencies concerned have been appropriating water from the District Basin for such period as, in all probability, to have gained prescriptive rights to take certain quantities of its water, though it would require comparison with like data respecting the appropriations on the part of appellant cities, of water from the Santa Ana River System to make any determination as to their respective priorities, and neither the respondent district, choosing as it has to plant itself, so far as its claim to relief in this case is concerned, solely on the overlying rights of agricultural lands within its borders, has undertaken to make any such comparison nor has the trial court undertaken to do so in its findings. Accordingly, we think it is true that these seven exhibits (22, 25, 26, 27, 28, 30 and 68) should be disregarded as having no bearing on our present inquiry *i.e.*, whether plaintiff district has affirmatively established the rights of the owners of its agricultural lands to water from the District Basin. The question of the bearing of these seven exhibits must be postponed until we reach a later stage in the discussion, when, if such rights shall, from other evidence, be found to exist, we shall come to inquire whether they are being infringed, by devotion of waters to which their owners are entitled to other uses, and if so, by whom.

The plaintiff district placed in evidence the large map above referred to (Exhibit 116) showing the exterior boundaries of the district and also the exterior boundaries of the portion of the same overlying the District Basin or area of

percolation from waters of the Santa Ana River, and the sites of the various wells sunk therein. Of these, according to the accompanying testimony of Howard W. Crooke, secretary-manager of the district, 3,457 are active producing wells. The district, according to him, keeps a file in which it keeps, pursuant to provisions of the act under which the district operates, lists of all such wells and their ownership with water production statements on forms furnished by the district filled out each six months by the various owners or well users, including, when possible, statements of the use to which the water is put, the number of acres served and the quantity of water produced during the year involved. These statements appear to be those required by sections 24 and 29 of the District Act as amended in 1953 (Stats. 1953, ch. 770, pp. 2035, 2060, 2063.) A tabulation with respect to 3,449 of these wells, for which such statements were available, was made by the district and is in evidence as its Exhibit 117. It shows the total ground water produced by these wells between July 1, 1954, and June 30, 1955, to have aggregated 141,125.8 acre feet. While this exhibit lists the wells operated by the several cities and public utility agencies within the district separately from those operated by individuals, the listing of the latter shows, in various instances, the devotion of the water to domestic or other nonagricultural uses, and fails to show how much of the water produced from wells of public utility corporations may have been devoted to urban and how much to agricultural uses. Nor can it be determined whether all of the water listed as devoted to agricultural purposes after being drawn from the District Basin was used on lands within the boundaries of the basin or some of it elsewhere.

Insofar as the statements mentioned had to do with the quantities of water produced they were expressly required by the statute and the district was also empowered by the statute to require such other information as it in fact sought from the water producers. We think, then, that, although in some sort hearsay, these very numerous statements, had they been brought into court, would have been admissible (Code Civ. Proc., § 1920), and that, in the absence of any demand that they be produced, the summary from them compiled by the district was properly admitted for what it was worth.

The witness Crooke testified that after receiving the statements he estimated from them and reported to the directors

of the district that of the water shown to have been produced 32,640.6 acre feet was "for domestic and other non-irrigation purposes." That, he said, "would be the city production," but he testified further that it would include various "water works districts" when the "water production is for domestic or other than irrigation purposes." If the figure of 32,640.6 were deducted from the figure of 141,125.8, above referred to, it would leave 108,485.2; and if that were taken to be the total of water produced from the District Basin and devoted exclusively to agricultural use on overlying lands for the year beginning July 1, 1954, and ending June 30, 1955, it would be materially less than the 126,617 acre feet found by the court to have been the needs of these lands for the calendar year 1955.

It is possible that in the voluminous record there may be other items that have escaped our attention that have some bearing on the effort to fix with precision the aggregate total amount of water needed to satisfy the riparian or, more strictly, overlying rights of the overlying agricultural lands, represented by the district, but we think we have sufficiently stated the substance and character of the evidence adduced for that purpose. In sum, then, we think that the Exhibits 4, 5A, 5B, and the testimony of the witnesses Wahlberg and Tubbs do, when taken together, afford *some* evidence in support of those portions of finding X that we have quoted, that this evidence finds some support in the aerial map, Exhibit 90, when taken in connection with the testimony of the witness Stumph, and that it is partially, though not entirely, supported by the plaintiff's Exhibits 116 and 117, when considered in connection with the testimony of the witness Crooke.

Taking it, then, to be true that we have evidence here that the owners of land overlying the District Basin, represented by the district, have overlying water rights reasonably requiring the use of something like 126,617 acre feet of water per annum, what is the effect of their failure to extract that amount by pumping and their resort instead, for part of their needs, to the water companies who take their supplies for the most part at intakes outside the district? The contributions from these water companies would go far to explain any discrepancies between the 126,617 acre feet more or less, required and the amounts which the agriculturists actually

pump. Obviously these companies, whether they are to be treated as in strictness mutual water companies or not, although both operate some wells, are not primarily exercising riparian or overlying rights. Essentially they are appropriators of water. It apparently is the contention of appellants that insofar as the owners of overlying agricultural lands are using this company-appropriated water they are not exercising their own overlying or riparian rights and therefore that the quantities of appropriated water that they use are to be subtracted from what their reasonable needs for irrigation have been found to be. One answer to this, however, is that a riparian or overlying landowner does not lose his rights as such by mere nonuser. ▄▄▄ As the matter has been succinctly put in a recent expression by the United States District Court for the Southern District of California:

"The riparian right is not based on use and is not lost by non-use; however, to the extent that water is not presently being used by riparian proprietors under their riparian right it is subject to appropriation and beneficial use by others, the riparian owners being entitled to a declaration of their superior right to make reasonable beneficial use of the water in the future, but not entitled to enjoin storage or use of water by an appropriator which does not conflict with their own present reasonable beneficial use." (*United States v. Fallbrook Public Utility District,* 165 F.Supp. 806, 824, citing *Meridian, Ltd.* v. *City & County of San Francisco,* 13 Cal.2d 424, 445, 447, 458 [90 P.2d 537, 91 P.2d 105]; and *Gin S. Chow* v. *City of Santa Barbara,* 217 Cal. 673, 683, 691 [22 P.2d 5].)

▄▄▄ The situation of the holders of overlying rights is, of course, in this respect, no different from that of holders of riparian rights. Whether they presently use their overlying rights or not, they are entitled at least to a definition of whatever prescriptive rights the users above them of waters tributory to their own basin may have, and to such declaratory relief as shall prevent the further extension of such upstream prescriptive rights to the detriment of their own future use of their own rights. If, indeed, in consequence of failure on the part of such lower overlying owners to use some part of the water to which their overlying rights entitle them, there results a temporary surplus upstream, then such surplus may properly be appropriated by upstream users, but only for

such time as the lower overlying owners do not need it for reasonable beneficial use on their own overlying lands. Any claim, then, on the part of appellants that lower overlying owners are not fully using what they claim as their overlying rights cannot go to the right of the overlying owners through the district, to relief in this action, but only to the nature and extent of the relief.

But there is another aspect to the situation. While it is settled law that a downstream appropriator of water cannot by any length of use gain prescriptive rights as against an upper riparian owner, the same doctrine is not applied as between two appropriators but as between them the rule is first in time, first in right. (*Town of Antioch* v. *Williams Irr. Dist.*, 188 Cal. 451, 457 [205 P. 688], and cases cited.) There can be no question that the two companies here involved have for much longer than the time required to gain prescriptive rights and for much longer than any addition can in recent years have been gained to the prescriptive rights of appellant cities, been diverting large quantities of water from the Santa Ana River and now have prescriptive rights to do so. To whatever extent then the overlying landowners within the plaintiff district have forborne the exercise of their overlying rights in consequence of taking water from these appropriating companies, any opportunity that such overlying landowners can be conceived to have thus given to upper appropriators to use water equivalent to what they have themselves thus failed to pump, has been in the same instant cancelled by the companies' use of *their* prescriptive rights, in furnishing an equivalent amount of water on the overlying owners' land, all to the exclusion of the would be later upstream appropriators.

 So far as the right of the district to protection against encroachment on the water supply by upstream appropriators is concerned, it seems to us to make no slightest difference whether their overlying lands within the district obtain their water wholly through the use of overlying rights or in part from corporate appropriators. In either event it is water from the river system. And as the district represents both the overlying land owners and the two corporate appropriators, although it says it need rely only on the rights of the former, it has to the extent that it may have failed to show full use of their rights by the former, *ipso facto* established the beneficial use of appropriative rights by the latter. In either

event, unless there be a surplus there is nothing left for new upstream appropriation.

The correctness of finding XI to the effect that above 19 million dollars has in the course of the last 50 years been expended in providing facilities to produce water for irrigation within the District is not disputed.

In discussing the findings up to this point and particularly finding X and the evidence adduced to sustain it, we have been mainly concerned with the inquiry whether the district has established any affirmative rights in any of those whom it undertakes to represent for which it is entitled to invoke the court's protection. Having concluded that such rights do appear, we proceed next to inquire whether they are endangered or being infringed.

We are brought, then, to consider a series of findings, that are of crucial importance in the case, having to do with what respondent district contends is a dangerous shortage of water affecting the whole river system. These findings begin with that part of finding XII which reads:

"There is and during the foreseeable future will be, an overdraft in each and all of the basins (the Upper Basin, Middle Basin and Lower Basin) and an overdraft upon the Santa Ana River System as a whole. There is no surplus water subject to appropriation either in the stream system of or in the watershed of the Santa Ana River or in any of the basins or sub-basins thereof. The well levels in the entire Santa Ana Valley have been dropping in dry cycles and with each dry cycle they have dropped to a lower level than in the preceding one."

Again it is found that: "The average total natural supply of water within the Santa Ana watershed is not now and will not be in the future sufficient to meet the needs of the area."

In finding XIII it is stated that as far back as 1945 the overdraft in the District Basin exceeded 20,000 acre feet per year; that in 1955 the total natural flow of the river at Prado Dam amounted to only 49,180 acre feet, and in that year "the overdraft in the District Basin resulting from the needs of overlying landowners whose lands were used for agricultural purposes was in excess of 77,000 acre-feet of water without taking into account other overlying uses or the needs of others within the plaintiff District."

As counsel for the district say in the supplement to their brief: "The figure of 77,000 acre feet is computed by sub-

tracting the total natural flow of the river, 49,180 acre feet at Prado Dam . . . from 126,617 acre feet, the irrigation requirement for overlying agricultural lands in the District established by Exhibit 5B, the difference is 77,437 acre feet.''

It is apparent enough that there is no surplus, whatever be the cause of the deficiency.

 It cannot be successfully disputed that the trial court correctly found that: ''The quantities of water reaching Prado Dam from the upper and middle Basins are the principal source of supply to the District Basin, and said quantities under the long time mean or average conditions of rainfall and runoff are less than the amounts necessary to meet the needs for beneficial uses within plaintiff District.''

According to the witness Bailey ''the bulk of the supply for all portions of the watershed originates at the upper end of the drainage area.'' Our attention is, in that connection, called to the plaintiffs' Exhibit 59 from which it appears that the volume of the unimpaired natural mean seasonal runoff for the San Bernardino Basin is 182,178 acre feet per season, for the area between the Bunker Hill Dike and the Prado Dam 73,922 acre feet per season, and for the Lower Valley only 23,895 acre feet per season. As has been seen, the requirement for proper irrigation of the agricultural lands overlying the District Basin has been estimated for the year 1955 at 126,617 acre feet. According to the plaintiffs' exhibit the requirements for all the agricultural land in the district, *i.e.*, both that overlying the District Basin and that which does not overlie it, were for the same year 154,148.28 acre feet, and to all of that is to be added the requirements for other beneficial uses within the District including its urban areas. Our attention is also called to a diagram, plaintiffs' Exhibit 108, prepared by the district, showing, as counsel say, that in every year after 1926-1927 the natural seasonal inflow to lower Santa Ana Canyon, measured at the United States Geological Service Gauging station below the entrance to the lower Santa Ana Canyon, less 90 per cent of the Colorado River water discharged into the Santa Ana River near Arlington, was less than 154,000 acre feet per annum.

In finding XIII there follow statements relating to the importation of Colorado River water in large quantities and at great expense by the district and cities and other agencies therein in the effort to deal with the shortage, and further findings to the effect that the shortage in the District Basin

is not due to local excess there in the use of water nor to drafts upon the local underground supply within the district.

We seriously question whether the evidence supports the trial court's finding that there has been no excess within the district in the use of water nor in drafts there upon the underground water supply. It is, indeed, fairly inferable from the circumstances that the agricultural lands within the district and overlying District Basin require 126,617 acre feet of water per annum and are only pumping a part of that amount and getting the rest from the two corporations that appropriate water in the Santa Ana Canyon, that *those* agricultural lands are not using water to excess and certainly that *they* are making no excessive drafts on underground water. Likewise is it plain that the two corporations appropriating water in the canyon are acting within their prescriptive rights. It is not so clear, however, that the cities within the district are doing so. Their population and use of water are both rapidly increasing. The court has made no finding as to the extent of their prescriptive rights to extract water from the underground basin beneath them. It does appear, of course, that they are importing large quantities of water from the Colorado River through the Metropolitan Water District to eke out their supplies. It is not clear, however, that they are importing enough water to offset any consumptive use of water that they may be making in excess of such prescriptive rights as they may have. The failure of the district to prove and the failure of the trial court to find the amounts of their respective prescriptive rights, is, therefore, most unfortunate.

Finding XIV begins with the assertion: ''The rainfall and runoff in recent years have been below normal; such climatic conditions have not caused but have accentuated the overdraft in the District Basin and the overdraft in the entire Santa Ana River System.''

Also that: ''The quantities of water reaching Prado Dam from the Upper and Middle Basins are the principal source of supply to the District Basin, and said quantities under the long time mean or average conditions of rainfall and runoff are less than the amounts necessary to meet the needs for beneficial uses within the plaintiff District.''

While appellants have made numerous objections to the admissibility of evidence, particularly documentary evidence, offered by the plaintiff district and admitted by the trial court, they do not and cannot seriously dispute the existence for a

considerable time in the past, nor the present existence, of a grave water shortage throughout the river system. We think the overwhelming evidence supports the findings of the trial court insofar as they go to the point that such a shortage has long existed and now exists. Neither can there be any doubt that the shortage results from the discrepancy between the supply of water afforded by rainfall and runoff on the one hand and the consumptive use of water on the other.

Appellant cities, on the other hand, urge that lack of rainfall is the whole explanation for any shortage and that any lack of water is caused by cyclic decrease in rainfall, not by drafts upon the system above the Riverside Narrows, the implication, of. course, being that wet cycles, whenever they shall occur, will in greater or less degree automatically restore the balance.

The further finding by the trial court (included in finding XII, *supra*) that the "well levels in the entire Santa Ana Valley have been dropping in dry cycles, and with each dry cycle they have dropped to a lower level than in the preceding one" can hardly be denied, though some exceptions have been noted in appellants' briefs, but the situation thus found to exist does not in itself tend to disprove appellants' claim that the trouble is attributable to climatic conditions. It could disprove that claim only if it were shown that, while taking wet and dry cycles together over the period that the well levels were dropping, the average precipitation was either increasing or constant. Respondent's contention that since the turn of the century overall rainfall is increasing is not borne out by the San Bernardino rainfall records, which are those of most significance here. Their effect would appear to be to the contrary, as summarized at pages 125-126 of the closing brief for the cities of San Bernardino, Redlands and Colton. Moreover, such a contention is contrary to the trial court's finding XIV, just quoted, that "the rainfall and runoff in recent years have been below normal . . . ," and to counsel's own argument at page 99 of the supplement to the District's brief made in support of that finding.

We shall have occasion, however, to consider the effect of climatic changes hereinafter in discussing the trial court's finding XVI and therefore leave the further discussion of that subject until we reach that finding.

The next finding to be dealt with is that numbered XV. There is of course no question that, as noted in its opening

sentence: "The defendants have, and each of them has, for many years past, taken, pumped, received, and/or diverted water from the natural supply of the Santa Ana watershed."

This finding then proceeds to adopt an attached Exhibit B consisting of tabulations, constituting the plaintiffs' Exhibit 39 in evidence. This exhibit sets out the respective water producing facilities and sources of supply of each of the appellant cities, together with the quantities of water produced and received from each such facility and source of supply during the water years 1940-1941 to 1954-1955 inclusive, and also shows in columns headed "Prescriptive Right" what the finding states is the "highest quantity of water produced by each defendant from each of its respective facilities and sources of supply in each of the five consecutive years preceding the filing of the complaint."

It is further found that, with the exception of certain quantities shown on the exhibit produced by the city of Riverside from what is known as Jensen Slough and used by that city on the parcel of overlying and riparian land from which the same were produced, none of the water produced by appellant cities was or is used on the parcels of overlying or riparian land on which the same was or is produced.

The city of Riverside is correct in contending that, in addition to the water that it obtains from Jensen Slough, that which it gets from the facilities known respectively as the Springbrook diversion and the Davis and Burton wells should be classified as water used in the exercise of its riparian or overlying rights and excluded from that which it appropriates. The testimony of the witness Kennedy is clear that use of water from the Springbrook diversion, when available, has been used by the city on the land where it is produced, although it is true that this source of water has in recent years been intermittently dry. His testimony also is that in case of both the Davis and Burton wells, the water produced is used on the land where the wells are, in the former case for agricultural purposes and in the latter for a golf course. That both the Davis and Burton wells are operated not by the city but by its tenants is wholly immaterial. The stipulation to which respondent's counsel refer as negativing the city's right to have the use of water produced from these three sources classified as an overlying use is inapplicable. The stipulation was obviously intended to apply only to appropriated water.

It is further found that of the total quantity of water pro-

duced annually by appellant city of Redlands, 1752 acre feet thereof is not used for municipal purposes but is delivered by that city to other water users known in this action as "prior right owners." Except for said 1752 acre feet, it is found that all of the water taken by each of the appellants "has been and is received into their respective distribution systems and thereafter has been and is furnished to their respective inhabitants and to the inhabitants of territory surrounding and adjacent to said cities for municipal, domestic and other beneficial uses."

The finding proceeds: "The highest total quantity of water, which each defendant openly, notoriously and adversely to the whole world, and under claim of right so to do, has continuously produced, as aforesaid, in each of five consecutive years preceding the filing of the complaint herein from their respective facilities and sources of supply, as aforesaid, and has used for municipal, domestic and other beneficial uses as aforesaid, is as follows:

"Defendant City of Riverside, 10,288.49 acre feet;

"Defendant City of Colton, 3,540.00 acre feet;

"Defendant City of San Bernardino, 13,056.63 acre feet;

"Defendant City of Redlands, 9,588.23 acre feet."

Appellants claim that even if they are to be held to their prescriptive rights, the trial court erred in computing them. Sundry errors in the method of computation are assigned. (1) All of the water used by the cities of San Bernardino and Colton has been drawn from wells. The same is true only in part as respects the city of Redlands which maintains some surface diversion and also obtains water through its ownership of stock in certain mutual water companies. The city of Riverside also obtains portions of its supply from mutual water companies through its ownership of stock therein. The trial court computed the prescriptive rights of each city on the basis of the amount of water taken by it separately from each well or other facility for the full period of five years next preceding the filing of the complaint, totaling these several amounts, and treated their sum as what it found to be the measure of the prescriptive rights of such city. As counsel for the city of San Bernardino point out "the evidence established that during the five-year period immediately preceding the filing of the District's complaint San Bernardino had abandoned and reduced production from certain wells for various reasons." On the other hand it "had drilled or

acquired new wells and increased the amount taken from others in order to continue to have the amount of water required for its uses."

In the method of computation employed the trial court clearly fell into error. It is provided in section 1706 of the state Water Code that:

"The person entitled to the use of water by virtue of an appropriation other than under the Water Commission Act or this Code may change the point of diversion, place of use, or purpose of use if others are not injured by such change, and may extend the ditch, flume, pipe, or aqueduct by which the diversion is made to places beyond that where the first use was made."

All of the appropriations by appellant cities, except to a very limited extent that of the city of Redlands, are of percolating waters, and so far as we know, not even in the exceptional case of diversions by the city of Redlands, has the appropriation been made under the statutory provisions referred to. Accordingly there appears to be no legal impediment to their changing the points of diversion at will provided no one else is injured thereby (*City of San Bernardino* v. *City of Riverside,* 186 Cal. 7, 28, 29 [198 P. 784]. See also our opinion in connection with the writ of supersedeas in the instant case, 171 Cal.App.2d 518, 523-524 [340 P.2d 1036] ; also, *Burr* v. *Maclay Rancho Water Co.,* 154 Cal. 428 [98 P. 260].) The source of supply remains the same—the Santa Ana River System.

■ We are not impressed by respondent's claim that the objections to the method of computation come too late. It is true that they might earlier have been more specifically made. Objection, however, was made to the reception in evidence of the plaintiff's Exhibit 39 in which the method of computation now objected to was used and such objection was overruled by the trial court.

■ As respects appropriated water, produced by any of appellant cities from the Santa Ana River System or any part thereof, the proper method of arriving at the measure of the prescriptive right of the appropriating city, is to take the whole of its production from all its wells and other municipal facilities used in producing appropriated water, including discontinued wells and wells in service for less than five years, and to use as the final result the highest total production shown to have been continuously maintained through the necessary

five years. From this computation there should be excluded all waters obtained by a city in the exercise of riparian or overlying rights as, for example, those obtained and used by the city of Riverside on lands overlying Jensen Slough, since these are not concerned with appropriated water.

 (2) It is also our opinion that the trial court should have excluded from its measure of the prescriptive right of any city to take water from the river system all appropriated water obtained by such city through its ownership of stock in a mutual water company or obtained by it from any other agency not a part of its municipal organization, and that in failing to make such exclusion in dealing with the prescriptive rights of the cities of Riverside and Redlands it again fell into error. This phase of the case has been given considerable attention in the briefs for the respective parties and also in amici curiae briefs filed by counsel for various mutual water companies. Counsel for respondent district assert that the whole subject is "outside of the issues and the record." It is true that nothing is said about it in the pleadings but the trial court has in its findings injected it into the case by including in the prescriptive quotas of the said two cities the water so obtained. The trial court, moreover, has in each of the paragraphs II, III, IV and V of its judgment, in adjudicating the prescriptive rights of the several appellant cities, adjudged each to have "a prescriptive right to take, pump, *receive,* divert and/or appropriate from the natural water supply of the Santa Ana River System, either directly through facilities of its own within the Santa Ana River watershed or indirectly through the facilities of others within the Santa Ana River watershed, the total quantity of water not to exceed . . ." a stated number of acre feet.

So, too, in paragraph VI of the judgment the rights of the district and those whom it represents are stated to be paramount to the right of appellant cities to "take, pump, *receive,* divert, or appropriate water from any source or sources within the watershed."

Paragraph VII of the judgment is to the effect that: "Each of the defendants and its agents, servants, employees and all persons working and/or acting for or under it, is hereby perpetually enjoined and restrained from taking, pumping, *receiving,* diverting and/or appropriating any water from the natural supply of the Santa Ana River System or from sources within the Santa Ana River water shed in excess of its respec-

tive rights as set forth in paragraphs II, III, IV and V hereinabove.''

There are other connections in the findings, conclusions of law and judgment in which the word *"receive"* is similarly employed, but enough has been said to make it clear that the subject is before us to be dealt with.

It appears to be acknowledged that mutual water companies are of two types. As is said in respondent's brief:

"In the first type of mutual water company landowners with riparian or overlying rights join together and form a company to effect economy and promote convenience by use of joint production and distribution facilities. There is the formality of a conveyance of the individual water rights to the company, but the rights remain appurtenant to the lands of the stockholders. (*Estate of Thomas*, 147 Cal. 236, 242 [81 P. 539] ; *Locke* v. *Yorba Irrigation Co.*, 35 Cal.2d 205, 209 [217 P.2d 425].) The company is merely the agent of the riparian or overlying landowner whose rights are being exercised on their behalf. It is unquestionably true that any attempt by a city through its acquisition of stock in such a company to transfer the water from out on the land where it is produced to the distribution mains of the city would be no longer the fulfillment of a riparian or overlying right, but would be the making of a new appropriation, which would be lawful only if there were a surplus to be appropriated, which is not the case here.''

We do not, however, understand that the cities here claim any right to obtain water from mutual companies of that type. They claim only the right to obtain additional water from mutual companies that themselves take it from the system as appropriators and to no greater extent than the appropriations of that type of mutual companies have ripened into rights by prescription. Counsel, however, say that such companies ''do not acquire rights in gross to produce and sell water.'' We are not here concerned with the internal affairs of mutual water companies or what as between themselves and their stockholders they may or may not be entitled to do with appropriated water. But so far as the public is concerned their status as respects appropriated water is not different from that of other appropriators. ■■■ As we said in our recent opinion rendered in connection with the writ of supersedeas in the instant case:

"It is undoubted law that a lawful appropriator of water

may at his discretion alienate his right as such (*Spargur* v. *Heard*, 90 Cal. 221, 228, 229 [27 P.198]; *Calkins* v. *Sorosis Fruit Co.*, 150 Cal. 426 [88 P. 1094]; *Copeland* v. *Fairview Land & Water Co.*, 165 Cal. 148, 166 [131 P. 119]; *E. Clemens Horst Co.* v. *Tarr Mining Co.*, 174 Cal. 430, 433 [163 P. 492]; *Harrison* v. *Chaboya*, 198 Cal. 473 [245 P. 1087]; 25 Cal. Jur. Title 'Waters' § 209, p. 1198.) █ It has often been held than an appropriator may at his discretion change the place of application of his water, though not where the change causes injury to those having superior rights (*Maeris* v. *Bicknell*, 7 Cal. 261, 263 [68 Am.Dec. 257]; *Davis* v. *Gale*, 32 Cal. 26 [91 Am.Dec. 554]; *Ramelli* v. *Irish*, 96 Cal. 214, 217 [31 P. 41]; *Jacob* v. *Lorenz*, 98 Cal. 332, 340 [33 P. 119]; *Gallagher* v. *Montecito etc. Co.*, 101 Cal. 242, 246 [35 P. 770]; *Santa Paula Water Works* v. *Peralta*, 113 Cal. 38, 45 [45 P. 168]; *City of San Bernardino* v. *City of Riverside*, 186 Cal. 7, 28, 29, *supra*). █ It has likewise often been held that an appropriator of water may at his discretion change the use to which his water is put, provided it continues to be devoted to some legitimate beneficial use, and provided the change in its use does not injure those having superior rights (*Davis* v. *Gale, supra*; *Ramelli* v. *Irish, supra*; *City of San Bernardino* v. *City of Riverside, supra*; 26 Cal. Jur. Title 'Waters,' § 379, p. 174.) These decisions continue to state the law except as affected by subsequent statutes."

Cities, moreover, are authorized by the express terms of article XII, section 13 of the state Constitution to acquire stock in mutual water companies, and, having done so, to exercise all of the "rights, powers and privileges" conferred by law upon other stockholders; and by the express terms of section 330.24 of the Civil Code, such corporations are authorized to sell water to any public agency.

█ Insofar as mutual water companies or any other agencies appropriate water from underground basins their appropriations are not made under the authority of sections 1200 and 1201 of the state Water Code. It is urged that when they divert water from agricultural to urban uses this amounts to a new appropriation. Such, however, appears to be the rule only as to water appropriated under the Water Commission Act or now under the Water Code (§ 1700). Thus, according to the Code Commissioner's note to the last cited section "The appropriator claiming by virtue of an appropriation prior to the act is neither required nor permitted to proceed

under the act to obtain permission to change the purpose of use but may change it without permission . . .," and we have already quoted the express provisions of section 1706 of the Water Code to that effect.

Insofar, then, as mutual water companies or other agencies are lawfully enjoying the use of water appropriated otherwise than under the Water Commission Act or the code, a change in the place or purpose of use is not a new appropriation, nor does use by a transferee in such circumstances make him a new appropriator. It is true that such change in either the place or purpose of use may not be made to the detriment of others having superior rights. Whether in any given case it amounts to such a detriment is a matter for decision on the merits of such particular case, but in any event, it does not in the case of an appropriation other than under the Water Commission Act or the Water Code amount to a new appropriation. It necessarily follows that the inclusion of appropriated water obtained by the cities of Riverside and Redlands from nonmunicipal agencies such as mutual water companies, not shown to have made their appropriations either under the Water Commission Act or the Water Code, in the quantities in which the cities were found and adjudged to be entitled under their prescriptive rights was improper. Such right as the cities had to get water, was dependent, not on the validity of their own appropriations, but on those of the agencies from which they obtained it. Whatever right they may have had to it was additional to and not a part of their own prescriptive rights.

(3) Counsel for the cities of San Bernardino, Colton and Redlands also complain because, in computing their prescriptive rights, the trial court did not allow them the highest amount that they respectively produced within the five years next preceding the filing of plaintiff's complaint. This contention is based on certain language employed in the Supreme Court opinion in *Eden Township County Water Dist.* v. *City of Hayward,* 218 Cal. 634, 638-639 [24 P.2d 492], as follows:

"The only safe rule is that defendant be restricted to the maximum amount of water heretofore actually diverted and beneficially applied during a given period of time. In other words, the extent of its previous beneficial use is the measure of its existing right.

"It seems clear also that the greatest amount diverted and

used in any one calendar year of the prescriptive period should likewise be the limit beyond which the city may not claim. . . . To restrict respondent to such annual maximum is not to measure the right by averages, as contended by it, but is to measure it by the highest exact volume of water previously used.''

We think, however, that the language above quoted from the Eden case was not intended to carry the meaning which these appellants attribute to it. Certainly is it true that the greatest amount of water diverted and used in any one calendar year of the prescriptive period marks the limit beyond which no prescriptive right can be claimed. But that criterion is not the only one to be applied. It must also appear that such maximum use has been *maintained* for the requisite five years. That the court in the Eden case intended so to hold appears clearly from its quotation from Kinney on Irrigation and Water Rights, second edition, page 1895, section 1056, to the effect that ''The right acquired by prescription is only commensurate to the rights enjoyed during the *full* prescriptive period, and the extent of the enjoyment measures the permanent right.'' (Italics ours.)

In *E. Clemens Horst Co.* v. *Tarr Mining Co.*, 174 Cal. 430, 439 [163 P. 492], the rule is stated, to wit: ''A *continuous* adverse diversion and beneficial use of a given quantity (of water) for a single period of five years establishes the title to that quantity.'' (Italics ours.)

 It is, of course, true that ''the adverse claimant may establish a right to use water intermittently and for part of the season,'' and that ''if that right is insisted upon and maintained without interruption, a corresponding prescriptive right arises'' (*Armstrong* v. *Payne,* 188 Cal. 585 [206 P. 638]) and that ''An occasional suspension or interruption of the enjoyment will not defeat the right, if it arises from such causes as the dryness of the season; a temporary failure to exercise the right to the extent claimed; or fluctuations in the flow of the stream'' (*Ibid.,* p. 593). To the same effect is *Warren* v. *Crafton Water Co.*, 139 Cal.App.2d 314 [293 P.2d 506]. The claim, therefore, that the trial court here should have allowed appellants a greater prescriptive right than those maintained over a period of five years cannot be upheld. There are other features of the Eden case, however, which merit attention, as, for example, the proposition that

in determining whether an adverse use has been continuous, the use should be measured by yearly rather than monthly or daily periods. Taking as an example of the proper application of the rule, it appearing that in the water years 1946-1947, the first year of the five-year prescriptive period here involved, the city of San Bernardino withdrew 14,751 acre feet of water from the San Bernardino Basin, it must follow that its continuous use and, therefore, its prescriptive right cannot exceed 14,751 acre feet per annum, notwithstanding that in 1950-1951, the last year of the period, its withdrawal was 17,618 acre feet. If in that last year the withdrawal instead of being greater than in 1946-1947 had been less, say 14,000 acre feet, then the prescriptive use for the *full five years* could not be held to exceed 14,000 acre feet annually, and the prescriptive right could not exceed that figure. As respects any one or more of the three intervening years, a minor drop in the withdrawals, as in the case of San Bernardino for 1947-1948 to 14,625 acre feet, might properly be disregarded as insufficient to interrupt or change the general picture.

In sum, then, of the three objections made to the trial court's method of determining the prescriptive rights of appellant cities in the waters of the Santa Ana River System, we find the first two meritorious, but the third without merit. The net result, however, is that in the case of each appellant city the aggregate amount of its prescriptive right to water is in the findings and judgment incorrectly stated.

 The trial court further found that in the years following the filing of the complaint each of appellant cities has continued to take large and ever increasing quantities of water in excess of what were found to be their prescriptive rights and that "in the water year 1954-55, such excess quantities of the four defendants totalled more than 30,000 acre feet."

It is true that each of appellant cities in the water year 1950-1951, that is in the water year which had expired next preceding the institution of this action, was taking water in excess of what the trial court found to be its prescriptive right. It is hardly accurate, however, to say that each of them has since been taking "ever increasing quantities." The city of Redlands, for example, complains of this finding as applied to it. By reference to Exhibit "B" incorporated in the findings, it appears that, exclusive of such water as it acquired through mutual water companies, the quantities

taken by Redlands were for 1945-1946, 15,625.95 acre feet; for 1946-1947, 15,411.37 acre feet; for 1947-1948, 15,843.52 acre feet; for 1948-1949, 14,474.39 acre feet; for 1949-1950, 13,-943.23 acre feet; and for 1950-1951, 13,988.50 acre feet. On the other hand, for the four years next following the filing of plaintiff's complaint the figures are: for 1951-1952, 11,522.88 acre feet; for 1952-1953, 13,524.84 acre feet; for 1953-1954, 15,128.47 acre feet; and for 1954-1955, 15,084.94 acre feet. In other words, since the complaint was filed the taking of water by the city of Redlands for two years considerably dropped, and, though in the last two years for which figures are available the quantity rose again, it still did not, in either year, equal the amounts taken as far back as the water year 1945-1946.

The city of Colton took an aggregate of 4,814 acre feet in 1950-1951 and only 4,561 acre feet in 1951-1952, although its taking has increased in the last three years of the record.

The principal increases since the complaint was filed were in the amounts taken by the cities of San Bernardino and Riverside.

It is next found that: "Each of the defendants threatens to increase its taking of water from sources within the Santa Ana River watershed and, unless restrained by order of Court, will continue to take large and increasing amounts of said water to the great and irreparable damage and injury to the plaintiff District and the inhabitants thereof."

There is, as we have abundantly seen, no question about appellants' claim of right to take increasing amounts of water from the river system as they from time to time need it, or about their intention to do so, except possibly in the case of city of Redlands, unless prevented by court action. What they do dispute is the finding that such taking does or will damage the district or its inhabitants or anyone that it represents, irreparably or at all. The consideration of the respective contentions on that subject necessarily involves also the correctness of that part of finding XIV hereinbefore quoted and of the statement contained in the first sentence of finding XVI, to wit, that: "The quantities of water produced by the defendants and each of them reduce the natural flow of water to the plaintiff District by substantially the same amount."

It also involves the correctness of the further statement in finding XVI that: "Concurrent with the increased produc-

tion and use of water by defendant cities there has been a decrease in the portion of the natural supply of the watershed reaching Prado Dam.''

The appellant cities concur in contending that none of these statements finds substantial support in the evidence but, as we have seen, they assert that climatic conditions furnish the sufficient explanation of any shortages in the district's water supply that may exist. Respondent and appellants, respectively, have attempted, on the one hand to support, and on the other to attack these findings by comparison between the rainfall records for the upper valley area with the flows recorded at various points on the river, including the gauging stations at the Riverside Narrows and immediately below the Prado Dam.

In support of their thesis, counsel for appellant cities make comparisons between the rainfall during wet and dry periods and the flow of the stream for the same periods, as shown by gauges maintained at the Bunker Hill Dike, the Riverside Narrows and just below the Prado Dam.

As counsel for the cities of San Bernardino, Colton and Redlands note, the actual records of rainfall in the areas involved go back only to 1870-1871. Each of the years involved is, according to the practice of the United States Geological Survey, taken as running not like the conventional water year from October 1 of one year to September 30 of the next, both inclusive, but from July 1 of one calendar year to June 30 of the next, both inclusive. Our attention is called, as respects the rainfall figures, to the exhibit known in the record as San Bernardino-Colton Exhibit A.L.5 giving the record of the precipitation for San Bernardino for the years 1870-1871 to 1955-1956, both inclusive, for Riverside for the years 1882-1883 to 1955-1956, both inclusive, and for Colton from 1914-1915 to 1955-1956, both inclusive, measured in inches. The figures for the runoff into the San Bernardino Valley above the Bunker Hill Dike (San Jacinto Fault) from 1894-1895 to 1954-1955, both inclusive, also for the surface flow across the dike for the years 1929-1930 to 1954-1955, both inclusive, and for that at the Riverside Narrows for the years 1929-1930 to 1954-1955, both inclusive (but after deducting certain Metropolitan Water District releases) are set out in the San Bernardino-Colton Exhibit 18A, and our attention is called to a close correspondence between the recorded cyclic variation in rainfall and the measured variation in these stream flows. Analysis

of these figures is carried out at some length at pages 180 and 181 of the opening brief of the cities of San Bernardino, Colton and Redlands and the conclusion, as stated by their counsel, is that "the quantity of water flowing at the San Jacinto Fault" (Bunker Hill Dike) "and at Riverside Narrows has fluctuated for years in a pattern corresponding to the fluctuation in precipitation and mountain runoff and that two comparable periods produced approximately the same result," from which counsel urge that "it follows that the taking of water by the defendant cities has had very little, if anything to do with the flow at Riverside Narrows, where it is measured before it arrives at the boundaries of the District." Furthermore, counsel for San Bernardino, Colton and Redlands say that there also exists a correspondence between the variations in stream flows at the Bunker Hill Dike and Riverside Narrows, on the one hand, and, on the other hand, the stream flows of the Santa Ana River just below the Prado Dam (set out in San Bernardino and Colton Exhibit A.L. 83), above which any water that may have penetrated from the Colton-Riverside areas first to the north of the Jurupa Mountains, and thence through the Chino Basin would have reentered the river itself. While in this instance some parallelism may be noted between the flows at the Bunker Hill Dike and Riverside Narrows and those below the Prado Dam (summarized at page 126 of the San Bernardino, Colton and Redlands closing brief) the correspondence is far from exact. The flows as measured at Prado Dam do in their ups and downs follow the same general pattern as those above. However, they greatly exceed those either at the Bunker Hill Dike or at the Riverside Narrows.

We are somewhat at loss to account for the surprising large flows of water at the Prado Dam when compared with those at the Riverside Narrows. The court made no finding on the subject nor is there any adequate discussion of it in the briefs. The increment over the flow at the Narrows could come from only one or both of two sources—the percolation north of the Jurupa Mountains, which respondent's witnesses assert and the court found to occur, on the one hand, and contributions to the stream from creeks feeding the Chino and Temescal Basins, plus rainfall on the surface of these two basins, on the other hand. Even if the testimony for respondent is correct in the estimate that as much as 50 percent of the outflow from the basins underlying appellant cities finds its way out through such percolations, it would still seem

apparent that before the percolations reached the main stream above the dam they would have sustained a much greater loss than the other 50 percent of the flow in its relatively rapid course from the Narrows to the dam. The full explanation, then, of the increase in the flow at the Prado Dam over that at the Narrows could only come from contributions additional to those from the Jurupa percolations from such other sources as supply water to the Chino and Temescal Basins. The respondent's witnesses were inclined to minimize any such contributions from the San Antonio and Cucamonga Creeks, or minor watercourses feeding these two basins. It is most unlikely, however, that contributions attributable to these sources can be entirely ruled out or that there is an entire absence of return flow from water used in the extensive Chino Basin. It is plain, of course, that any contributions to the flow at the Prado Dam originating either in the San Gabriel Mountains or in any area west of the San Bernardino-Colton-Riverside region could not be adversely affected by use of water on the part of appellant cities.

All in all, however, while all of these uncertainties have to be considered, we still believe that the similarities between the variations in rainfall and those in stream flow are sufficiently striking to amount to a demonstration that cyclic decrease in rainfall has been one of the dominating factors in the dropping of the well levels. The circumstance that the witness Bailey, as pointed out at page 100 of the supplement to respondents' brief, was of the opinion that lack of rainfall "in the *District Basin*" was not a primary cause of the overdraft there is not to the point. The rainfall that we are mainly concerned with is that where the principal rainfall occurs, that is, at the upper end of the river system. We cannot say that this evidence goes so far as to show that climatic conditions are the sole cause of the shortage. But in our view the evidence is insufficient to support so much of finding XIV as determines that "climatic conditions have *not caused* but have accentuated the overdraft in the District Basin and the overdraft in the entire Santa Ana River System." It would have supported a finding that the combined effect of climatic conditions and the consumptive use of water from the system have produced that result.

In the present connection, however, where we have to deal with the above assertions from finding XVI, an evaluation of the evidence involves going a step farther and attempting

to determine whether or not withdrawals of water by appellant cities have had any appreciable effect and, if so, what effect on the stream flows. It does not seem to us practicable or necessary to attempt to carry the calculations downstream from the gauging station below the Prado Dam. For practical purposes the diversion by the two water companies operating in the lower Santa Ana Canyon may, in this connection, be disregarded, since, with insignificant exceptions, the water that they divert is actually used within the district and does not, therefore, diminish its water supply. To all intents and purposes, then, we may treat the river flow just below the Prado Dam as measuring that available for beneficial use within the district. The gauging station last referred to was, up to and through the water year 1939-1940, maintained at the Riverside-Orange County line. Since then it has been maintained in the present position below the dam.

Emphasis has been placed by appellant cities of San Bernardino, Colton and Redlands, both in their briefs, and as respects counsel for San Bernardino and Colton, in their oral argument, on a comparison between the measured inflow into the San Bernardino Basin from which San Bernardino and Redlands get all of their water and from which the cities of Colton and Riverside get major parts of theirs, and the outflow of the basin, during two periods of dry years, *i.e. first,* the period 1929-1930 to 1935-1936, both inclusive, and *second,* the period 1946-1947 to 1952-1953, both inclusive. Periods included in dry cycles were deemed to afford a better basis for comparison than in wet cycles because less disturbed by storms and other exceptional weather conditions. The particular two seven-year periods selected for comparison, according to appellants' witness, Dibble, were chosen because they were two periods each of sufficient length to enable fair tests to be made and in which the natural conditions were as far as possible similar, thus giving the best possible opportunity to evaluate the effects of drafts by appellant cities in the water supply. The periods were for ready reference designated respectively period "A" and period "B." In seeking to assure themselves of a similarity of natural condition between these two periods the first step involved the water table in the San Bernardino Basin. Two wells were selected for testing that, to wit, the Meecham well, described in the record as E-37, located near the margin of Warm Creek and another well designated in the record as E-107b about 5 miles away from it to the southeast. Dur-

ing period "A" the average height of water in the Meecham well above sea level was found to be 1074.4 feet above sea level and in period "B" 1074.1 feet. In the well E-107b the average level for periods "A" and "B" were respectively 1115.9 feet and 1110.9 feet. From these figures it was calculated that the average of the two wells taken together was in period "B" 2.7 feet lower than in period "A." (This data is given in the exhibit known as "A.L.36"). The rainfall at San Bernardino, treated as typical of that in the basin generally, averaged 13.86 inches per annum for period "A" and 11.9 inches per annum for period "B" (Rep. Trans. pp. 11045-11046), an average diminution of 1.87 inches. Finally, the measured discharge from the mountains into the San Bernardino Basin of the 11 streams (listed in the Exhibit A.L.9) which enter it was found from the United States Geological Survey records to have averaged, for period "A," 93,980 acre feet per annum and for period "B" 86,460 acre feet per annum or a diminution in period "B" from that experienced in period "A" averaging 7,520 acre feet per annum. On the other hand, the measured surface flow across the gap in the Bunker Hill Dike, inclusive of return flow from the sewage treatment plant of the city of San Bernardino, but exclusive of all other water produced from wells in the basin, amounted for period "A" to an average of 24,166 acre feet per annum and for period "B" to an average of 37,148 acre feet per annum (Exhibit A.L.36A) or an average increase of 12,982 acre feet per annum; notwithstanding that for the seven years of period "B" the draft on the San Bernardino Basin by the city of San Bernardino had increased by an average of 9,057 acre feet per annum (Exhibit A.L.36B) and the draft on the basin in the city of Colton had, for the seven years of period "B," increased over that for the seven years of period "A" by an average of 2,130 acre feet per annum.

This increase in the surface flow across the dike is attributed by the witness Dibble to the sewage effluent returned by the city of San Bernardino into the basin.

The picture thus presented is not entirely complete since it does not reflect any fluctuation in the withdrawals of water from the San Bernardino Basin during the years in question by the city of Riverside, which, however, the record shows to have averaged largely more per annum in period "B" than in period "A" thus making the comparison even more favorable to appellants' contention. Even if such drafts by the city of

Riverside were included in the picture it would still be incomplete because it takes no account of any fluctuation that there may, as between the two periods, have been in the average annual withdrawals from the basin of nonurban appropriators or in other withdrawals of water under riparian or overlying rights. Neither does it take into account the subsurface flows and percolations over the underground lip of the gap in the dike, which are incapable of exact measurement but which the witness Dibble (Rep. trans., p. 11605) believes to vary little from year to year, and estimates from data derived from a United States Geological Survey bulletin at 16,724 acre feet per annum.

With all these qualifications, as respects its completeness, however, the comparison does strongly contradict the trial court's finding (XVI) of any practical equivalence between appellants' withdrawals of water at particular times from the San Bernardino Basin and diminution of flows at corresponding times in the lower reaches of the river system.

Counsel for the city of Riverside in their opening brief present substantially the same point in a different way. They say:

"A comparison of the actual natural flow of the Santa Ana River at any particular point during the present dry period with the actual natural flow during the previous dry period is of no significance unless such flows are related to the natural water supply of the areas above the point in question. This is done by relating such flows to indices of the rainfall or runoff in the respective periods. In computing such an index, this rainfall or runoff in a particular year is compared with the mean rainfall or runoff over one or more complete climatic cycles and is expressed as a percentage of such mean. Since the mean is expressed as 100%, the index for a particular year in a wet period is generally above that amount, while the index for a particular year in a dry period is generally below that amount."

Three tabulations of such indices were submitted at the trial, one in connection with the respondent district's witness, Paul Bailey (Plaintiff's Exhibit 65); another in connection with the testimony of appellant city of Riverside's witness Charles H. Lee (Riverside Exhibit B.F. and B.U.i); and the third in connection with the testimony of Edward L. Dibble, a witness for appellant cities of San Bernardino and Colton (San Bernardino and Colton's Exhibit A.L.10). These three

sets of indices are only in a general way comparable. When they refer to a year by a particular number (as 1910), we take them to mean the water year beginning in that calendar year (the use e.g. of the figures 1910 meaning the water year 1910-1911 and so on.) The Bailey indices are based on rainfall as measured on the valley floor at sundry stations above what is now the Prado Dam, some of which stations are below the Bunker Hill Dike. Mr. Bailey employs the mean of a 45-year period (1910 to 1955) in arriving at his average (100%) annual rainfall. The other two sets of indices are based not on rainfall but on runoff into the San Bernardino Valley from the adjacent mountains, employing in case of the Lee indices the average of the 32-year period 1904-1936 and, in the case of the Dibble indices, the 53-year period 1894 to 1946, both inclusive. As against a column showing his annual rainfall indices for each of the years 1930 to 1955, both inclusive, Mr. Bailey in Exhibit 65 sets out in parallel columns what he computes to have been (1) the storm flow, (2) the "naturally regulated flow," and (3) the total flow (i.e. the sums of the first two) at the Riverside Narrows for each of the years 1930 to 1955, both inclusive, and also what he computes to have been the storm flow, the "naturally regulated flow" and the total flow of the river at the gauging station below the Prado Dam (or prior to and through 1939 at its former location at the Riverside-Orange County line). Colorado River water for use in the area of respondent district, beginning with the year 1949 has been added to the river flow at a point somewhat upstream from the Riverside Narrows gauging station. The quantity of Colorado River water thus added is in its entirety treated as a deduction from the flow at Riverside Narrows and 90 per cent of it as a deduction from the flow at the station below the Prado Dam, the other 10 per cent being believed to be lost in the transmission between the two checking stations. With those corrections a tabulation, based on the said Exhibit 65, of flows at the Riverside Narrows and below the Prado Dam (or prior to and through 1939-1940 at the Riverside-Orange County line) is printed for ready reference in the appendix to the opening brief for the city of Riverside. This shows year by year the flows at the said two measuring points, and in parallel columns the indices for the same years according to Bailey, Lee and Dibble, respectively. A reference to this showing indicates that a wet cycle ended with the year 1922-1923, and was fol-

lowed beginning with the year 1923-1924 by a dry cycle. There seems to be some conflict of view between Mr. Bailey on the one hand and Messrs. Lee and Dibble on the other as to when this dry cycle ended, Mr. Bailey treating it as being 12 years having ended with the year 1934-1935, while the others treat it as having lasted 14 years and ended with the year 1936-1937. The difference is probably accounted for by the use by Mr. Bailey on the one hand of an index based on precipitation on the valley floor which he reports as high in 1935-1936 while the other two use an index based on flow from the mountains into the San Bernardino Basin which both report as low for that year. If in that year, as is entirely possible, there was a heavy rainfall in the valley but less than average in the mountains, this would explain the variation. The flow records both at Riverside Narrows and below the Prado Dam tend to show that the 14-year figure for this dry period is the more nearly correct. Then followed a wet cycle covering the nine years 1937-1938 to 1945-1946 both inclusive. With 1946-1947 there began a dry cycle, of which the end is not yet.

Now, as is said in the opening brief for the city of Riverside: "A comparison of the natural flow of the river at Riverside Narrows may be made by utilizing the average of said rainfall or runoff indices for both the previous dry period and the present dry period and the average natural flow during the previous dry period. If the average indices for the respective dry periods are combined into a ratio and multiplied by the *actual* average natural flow during the previous dry period, the result on the basis of said indices, is the *expected* average natural flow during the present dry period."

In this brief the formula is thus illustrated: "For example if the discharge of a stream at any particular point during the previous dry period averaged 300 acre feet annually and if the average runoff indices were 90 for the previous dry period and 75 for the present dry period, the *expected* average natural flow for the present dry period would be 300 multiplied by $\frac{75}{90}$ or 250 acre feet per year."

Pursuing this method of computation, and, for the sake of the argument, assuming Mr. Bailey to have been correct in treating the limit of the last dry period prior to the present one as having been only 12 years, the Riverside brief, at

page 114 thereof, presents in full a calculation showing that on the basis of his rainfall indices the *expected* average natural flow at the Riverside Narrows for that part of the present dry period for which data are available would be 24,625 acre feet whereas as shown by the tabulation in evidence it has actually been 28,947 acre feet. On the other hand, it is stated that if the full 14 years are treated as being the length of the previous dry cycle, a calculation (not reproduced *in extenso* in the brief), will on the basis of Mr. Bailey's rainfall indices show that the *expected* average natural flow at the Narrows for that portion of the present dry cycle for which figures are available would be 22,575 acre feet per annum; or, on the basis of Mr. Lee's runoff indices, 25,350 acre feet per annum, or on the basis of Mr. Dibble's runoff indices 25,150 acre feet per annum, all as against the actual measured average flow amounting, as aforesaid, to 28,947 acre feet. The conclusion urged is that the measured average flow at the Narrows being in fact greater than, under the climatic conditions, was to be expected, no room is left for the theory that increased use by appellant cities is responsible for a diminished flow.

The answer of respondent is that, as has been observed, it has produced testimony and the trial court has found that only a part of the overflow from the San Bernardino-Rialto-Colton and Riverside-Arlington Basins reaches the Riverside Narrows at all and that the rest percolates north of the Jurupa Mountains, thus by-passing the Riverside Narrows and joining the river lower down, whence it is urged that the flow at the Narrows is no test of the effect on the whole flow of the river, either of climatic conditions or of increased drafts by appellants. As to this it must be pointed out that the significance of the flow at the Narrows as an indicator of the extent to which climatic conditions, on the one hand, or drafts upon the basins above on the other, may have affected the total flow farther down, can be nullified only if it be believed that there has been a change in the *proportions* of the overflow from these upstream basins that respectively reach the Narrows or seep through to the north of the Jurupa Mountains, and that no reason exists for assuming generally, much less in dry years, that there is any substantial change in that proportion.

Following the same method, there is in the brief for the city of Riverside an analysis of the flows at the Prado Dam,

whence according to the computation thus made, which we do not here set out at large, it appears that for the earlier dry period (treated by Mr. Bailey as being 1923-1924 to 1934-1935, both inclusive) the average natural flow per year was 79,720 acre feet and for the present dry period, using Mr. Bailey's indices, the *expected* annual flow would be $\dfrac{82.4}{90.9}$ thereof or 72,250 acre feet per annum, while if, according to the opinion of Messrs. Lee and Dibble the former dry period be taken as being 1923-1924 to 1936-1937, both inclusive, then Mr. Lee's indices would indicate the *expected* natural flow for the present dry period to be about 60,400 acre feet per annum and Mr. Dibble's indices would lead to an expected natural flow of about 65,800 acre feet per annum. The actual flow at the Prado Dam, as measured, has averaged 56,813 acre feet per annum during the present dry cycle. Taking these figures, as they are given in the brief for the city of Riverside (and as mathematical computations they appear to be correct) we figure that the deficiency for the present dry period in the actual average annual flow at the Prado Dam, as compared to the expected flow, amounts, according to Mr. Bailey's view of the situation, to 15,437 acre feet; according to that of Mr. Lee, to 3,587 acre feet; and according to that of Mr. Dibble 8,987 acre feet. It is by one or another of these quantities, according to which witness we follow, that the diminished flow at the Prado Dam must be attributed to other than climatic causes. Counsel for the city of Riverside call attention to the fact that the production of water by all four of appellant cities through the current dry period has averaged 52,500 acre feet annually, and say that since the shortages referred to are as to that figure relatively small, it follows that there is no support for the finding that the natural flow of the river has been reduced by substantially the quantities of water produced by the cities. But that, of course, is a fallacy. As counsel for respondent point out, it assumes "contrary to the fact that none of the five cities ever produced a drop of water" prior to the beginning of the current dry cycle. If it be true that any production of theirs is concurrently and fully reflected in a diminution of the flow at the Prado Dam, then the natural flow at the Dam must have, when the present dry cycle began, already been diminished to the extent of such production, and any further diminution

that it could have suffered during the continuance of the dry cycle from production of water by the cities could only result from the increases in such production, not from its total amount. So far, the respondent has the best of the argument.

It is nevertheless our opinion that the physical situations shown conclusively demonstrate the incorrectness of the portions of finding XVI above quoted. We have already seen that it is the thesis of respondent that a considerable part, roughly estimated by its witness Bailey at 50 per cent of the natural flow of water that leaves the San Bernardino Basin for the Colton-Riverside area, by-passes the Riverside Narrows and, instead, percolates to the north of the Jurupa Mountains to ultimately rejoin the Santa Ana River between the Narrows and the Prado Dam. Where, then, during the present dry cycle as compared with the last one, has the increased production of water by appellant cities diminished the natural flow "by substantially the same amount"? Not certainly in the flow at the Riverside Narrows, which, as already shown, has been consistently greater than under the climatic conditions could have been expected. If, then, such diminution has occurred "by substantially the same amount" as the increases in production by appellant cities, it must have been reflected solely in a diminution of the quantities of water in the percolations north of the Jurupa Mountains, ultimately finding their way back into the river somewhere between the Narrows and the Prado Dam. But the evidence shows that such percolations are exceedingly slow. It may not take any 46 years, as has been suggested in the testimony, for a particle of water to penetrate something like 20 miles from some aquifer on the easterly edge of the Jurupa area to the Prado Dam, but whether the rate be two miles a year (*City of San Bernardino* v. *City of Riverside,* 186 Cal. 7, 21 [198 P. 784]) or even much less, it is apparent that any increment in the use by the cities will take a very considerable time to be felt at this dam. The illustration of pressure at one end of a hose instantly affecting water at the other end is not an apt one. While there is evidence that, in a state of nature there has been a condition of artesian pressures in the San Bernardino Basin, and to some extent in the Chino Basin, we take it that the areas in the latter affected by such pressures are much less and the theory of pressure above producing a like pressure below assumes, moreover, a degree of saturation in the distance through which the water is believed to percolate, at the level where the water is in motion, as finds no

support so far as we are aware in the record, as it affects the Chino Basin. Other factors affecting percolating water have to be taken into account, such as evaporation whenever it approaches the surface, diversion into side channels not directly leading to a stream, consumption in plant transpiration, and withdrawal by human agencies. The idea, then, that the addition or subtraction of particular or limited quantities of water to or from a body percolating through a distance of many miles will be with substantial exactness reflected in the flow of the stream into which it ultimately finds its way, is too precise to be credible.

If any expressions of respondent's engineers Bailey and Waddell are construed as asserting the contrary they must be disregarded as mere conclusions without support in the evidence and insufficient to raise a conflict. (*Estate of Purcell,* 164 Cal. 300, 308 [128 P. 932]; *Barnett* v. *Atchison T. & S. F. Ry. Co.,* 99 Cal.App. 310, 317 [278 P. 443]; *Brant* v. *Retirement Board of S. F.,* 57 Cal.App.2d 721, 733 [135 P.2d 396].)

We are not to be understood, however, as holding the evidence insufficient to justify a finding that, as a long term effect the use of water by appellant cities does tend substantially to reduce the average level in the water table both in the San Bernardino Basin and in all lower reaches of the Santa Ana River and thereby contribute to a long term deficiency of the supply in the river system as a whole inclusive of both its upper and lower basins, and to do the witnesses Bailey and Waddell justice, we think that was the gist of their testimony. We do not differentiate between a deficiency *after* the diversion of the surface stream by the two water companies which take it from the canyon below the Prado Dam, and that which would have occurred had they not been diverting it. So far as the present case is concerned the effect of the deficiency in either case is the same, *i.e.* a shortage of water in the district. What we do hold is that the evidence is insufficient to sustain the substantial equality found by the trial court to exist between the quantities of water produced by the appellants and each of them, and the reduction in the flow of water to the district; and that it is also insufficient to sustain the finding that the increased production of water by appellant cities and the decrease in the portion of the natural supply reaching the Prado Dam, have been, in any proper understanding of the word, "concurrent." The trial court's error, in our view, was not in finding appellants' increasing use of

water to be detrimental to the supply reaching the lower part of the river system, but in undertaking to find a practically exact correspondence between their extraction of water and the diminution of the flow to the district, a correspondence that is not within reasonable approximation shown to exist.

While the hydrological data compiled by the engineers for the appellant cities, some of which we have recited, convinces us that the trial court's thesis of an ascertainable correspondence between particular drafts by appellant cities on the water supply, and particular deficiencies in the flow to the Prado Dam and District Basin have no substantial support in the evidence, our conclusion to that effect is not inconsistent with our view that the trial court must be sustained in finding that the aggregate of appellants' drafts on the upper basins of the river system do adversely affect the long term sufficiency of the water supply all the way down the river. The relation between the drafts on a basin at a given time and the flow from it, then, or within any exactly measurable time thereafter, is not very susceptible of quantitative statement. Perhaps it can best be expressed by a homely illustration. Such a basin is not to be thought of as a cup held level into which water is being poured but which overflows only when it is completely filled. On the contrary, the surface of the San Bernardino Basin, for example, and so necessarily its supporting underground strata, slopes from the base of the mountains which largely surround it, toward the gap in the Bunker Hill Dike. This, so far as the ground surface is concerned, is the low point and thither, therefore, all surface streams which enter the Basin and all artesian waters which in it are forced upward to become surface streams, gravitate. Thither, also, such percolating waters as have not penetrated within the basin below the level of the underground lip of the gap in the dike, more slowly find their way. There is, however, a vast body of percolating water which, through ages of time, has found its way into permeable strata at depths below the level of the top of the underground lip of the gap in the dike and which would remain there indefinitely if not withdrawn by man. Voids created by withdrawals from these depths are not necessarily filled at once, for percolations vertically downward will be retarded wherever the intervening strata lack the permeability of those below them, or where underground aquifers make subsurface

flow downstream relatively easy. The result, however, of excessive drafts by human agencies on the ground water and the expansion thereby of underground voids at depths from which, owing to the elevation of the underground lip of the gap in the dike, no outflow is possible, will gradually divert more and more of the inflow of water into the basin and the water precipitated upon its surface, to filling such ever-growing deep seated voids. This will necessarily result in a gradual lowering in dry cycles of the water table below the surface of the basin, never completely offset in wet cycles. This is very graphically illustrated by the experience with the Williams well, referred to in the findings (Plaintiff's Exhibits 61, 88). The experience with that well, however, has been by no means unique. Respondent's engineer, the witness Bailey, on the map (Plaintiff's Exhibit 87) of the San Bernardino Basin, has drawn a heavy line around the area in which the waters of the various streams reaching the basin are commingled, and he has divided the enclosed area into nine zones lettered from "A" to "H," both inclusive. He has selected one well within each zone, one of which is the Williams well, and depicted as Plaintiff's Exhibit 86, separate hydrographs of each of these nine wells. These display, in various parts of the basin, a behavior substantially like that of the Williams well, showing a depression of the water level in a dry cycle and rise in a succeeding wet cycle, and a new depression in the next dry cycle deeper than in the preceding one. To further verify the pattern, this witness prepared a composite hydrograph (Plaintiff's Exhibit 88), involving 49 wells inclusive of the above mentioned nine, selected from points all over the basin. The resulting picture was again substantially the same. All of these hydrographs were plotted from data recorded by the San Bernardino Valley Conservation District. This gradual lowering of the general water table in the basin may not, for a considerable number of years, be reflected at all times, even though it will be reflected for part of the time in diminished surface flow or underground percolations over the lip of the gap in the dike, for thither all water that does not sink beyond the level of the lip must find its way. But for all of that, if the withdrawals of water from the basin in excess of replenishment of the voids so created, are allowed indefinitely to continue, it is a mere question of time when they must be reflected in a permanent and continuous decreased spilling from an

upper basin into the one next to it and so on, slowly but surely, all the way down the stream. To allow the development of such a condition would be repugnant to the whole water policy of the state, and it is the duty of a court of equity, when its powers are properly invoked, to take such measures as are reasonably necessary to prevent it.

A somewhat impressive illustration of the long term situation on the Santa Ana River System was presented in a tabulation lodged with the court by one of respondent's counsel at the oral hearing of this case as part of his argument, compiled from exhibits of record in the case, including those known as A.L.9 and A.L.11H. The comparison is between the eleven streams runoff into the San Bernardino Basin and the flow at the Prado Dam (or, prior to the change in gauging stations at the county line). Instead of a comparison of two seven-year periods of dry years, there are selected two periods of 19 years each, to wit, eight wet years 1914-1915 to 1921-1922, both inclusive, followed by 11 dry years 1922-1923 to 1932-1933, both inclusive on the one hand and eight other wet years, 1936-1937 to 1943-1944, both inclusive, followed by 11 dry years, 1944-1945 to 1954-1955, both inclusive. In the first 19-year period the aggregate inflow into the San Bernardino Basin was 3,161,590 acre feet of water or an annual average of 166,400 acre feet, and the aggregate flow at the Prado Dam site 2,658,200 acre feet or an annual average of 139,905 acre feet, which means that for that 19-year period the flow at the Prado Dam site averaged 84.1 per cent of the flow into the San Bernardino Basin. In the second 19-year period the aggregate inflow into the San Bernardino Basin was 2,860,262 acre feet or an annual average of 150,540 acre feet while the aggregate flow at the Prado Dam site was 1,706,824 acre feet or an annual average of 89,833 acre feet or only 59.7 per cent of the inflow into the San Bernardino Basin. From this it is computed that if during the later 19-year cycle the flow at the Prado Dam had continued at 84.1 per cent of the runoff into the San Bernardino Basin it would have amounted to 84.1 per cent of 150,540 acre feet, i.e. 126,604 acre feet or 36,771 acre feet more than it was.

This tabulation, of course, does not undertake to track down the cause of the diminished percentage of the flow into the San Bernardino Basin represented by the flow at the Prado Dam in the second 19-year period as compared with the first, which would involve the consideration of many complicated

factors, but it does demonstrate a condition on the river system as a whole which is ominous.

As respects the recent record, it developed on the cross-examination of the city of Riverside's witness, Lee, (Rep. Trans. 8417-18) that in a report made to that city (Plaintiff's Exhibit 134, p. 16) he estimated that there had been a loss in the storage of water in the San Bernardino Basin for the water years 1945-1946 of 88,967 acre feet; for 1946-1947 of 74,332 acre feet; for 1947-1948 of 139,759 acre feet, and for 1948-1949 of 104,180 acre feet. It is only fair to say that any comparable net loss had not theretofore been typical.

Both findings XV and XVI are responsive to the district's claim of irreparable damage to itself and those whom it represents; finding XV from threatened increase by appellant cities in their taking of water from the river system; and finding XVI, from such taking of water in excess of their prescriptive rights and its threatened continuance, which, as it is claimed, cannot be compensated in money damages.

According to counsel for the district (supplement to brief, page 105): "The irreparable damage which appellants deny is shown by the continued lowering of the water level in all parts of the District, by impairment of the quality of the water because of salinity and by actual salt intrusion into the respondent District."

Some lowering of the water table in dry seasons in an area where pumping is done, with a coincident lowering in the water level of wells in such an area, is normal. Room is thus made for recharging in the next season of adequate rainfall. Any temporary increased cost of pumping resulting from such seasonal lowering of water levels is not irreparable damage. Necessarily it is otherwise where the draft on ground water is so great that it is not made good by recharging and when the lowering of the water table is progressive as season follows season, so that over a period of years the recharging is insufficient to restore the losses and the water table is permanently lowered. This is the condition which in its finding XII the trial court has found to prevail "in the entire Santa Ana Valley," and which it illustrates by the example of "Williams" well in the San Bernardino Basin and the "Neff" well in the District Basin. While it may be that, were pumping long enough suspended the ground water loss would be gradually restored, a sufficient cessation of pumping in heavily populated regions such as those which

overlie both the San Bernardino Basin, the basins immediately below it and the District Basin is not practical and, therefore, the damage may be said to be irreparable, at least so far as any prospect of replacement by water originating within the watershed is concerned. Obviously, also, any considerable lowering of the water table in areas in proximity to the ocean, if carried to a point below sea level, increases the risk of intrusion of salt sea water, besides any deleterious effect it may have on the quality of the water already in the basin. Here, as pointed out in the supplement to the brief for the district, the testimony of the witnesses J. Bert Webb, Mrs. Frances Dodge and James S. White indicates that wells within the district have had to be abandoned because of saline intrusion. Appellants say that there is no evidence that any water user within the district has been deprived of the use of any water which he needs. Irreparable damage may, however, be sustained from whatever makes the supply less dependable, less satisfactory in its quality or permanently more expensive. We think that the evidence is sufficient to sustain the finding that the lowering of the water table in the district is resulting and will result in irreparable damage. Such damage, indeed, according to the evidence, is somewhat mitigated by the importation of Colorado River water, but there is no evidence that such water would be available to an adequate extent to remedy the current overdrafts, to say nothing of any increased overdraft, and the cost of importing it could evidently not be compensated by any single award of damages, as it would have to be incurred continuously from year to year without limit of time. Of course the mere showing that the district's water users are being damaged by a water shortage is not enough to justify relief. It must appear that it is not mere *damnum absque injuria*. In this case we repeat that we must conclude that, while the evidence does not justify the minimizing in the findings of the effect on the water supply of climatic conditions, it does justify the conclusion that the use of water in the areas occupied by appellant cities tends substantially to affect it, and that the taking of water by the cities is at least a material participating factor in that result. From this, there obviously being a deficiency and not a surplus of available water, it must follow that production of water as appropriators by appellant cities, in excess of their prescriptive rights is wrongful, and, though not the only cause, and although in the absence as parties to the action of other water

users in the upper and middle basins we cannot know which, if any, other wrongful diversions of water from the river system are occurring, yet appellants' overproduction is in a substantial degree *one* of the causes of the damage.

The matter dealt with in the trial court's finding XVII should be wholly eliminated from the case. The earlier part of it, having to do with the growth since 1948 of appellant cities and the incorporation within their limits of former agricultural land, is, as a statement of fact, open to no dispute. But the mere fact of the growth of appellant cities is no ground for any complaint by respondent and, therefore, it is incumbent on respondent to justify the making of any finding on the subject. Respondent's purpose, however, is not far to seek. In discussing the method used in computing the prescriptive rights of appellant cities we have noted the erroneous inclusion in the quotas assigned to the cities of Redlands and Riverside, of water not produced by themselves but obtained from mutual water companies or their nonmunicipal agencies, and in dealing with the application of the cities of San Bernardino and Riverside for a clarification of the writ of supersedeas issued herein, we have noted the desire of the city of San Bernardino to obtain additional water by acquiring from mutual water companies or other nonmunicipal agencies water to which such mutual water companies or other nonmunicipal agencies are entitled by virtue of prescriptive rights of their own. Respondent's counsel insistently object to the acquisition of such additional water by appellant cities. It is their claim that, even though such mutual water companies or other nonmunicipal agencies be held to have prescriptive rights to take such water from the river system, and even though it be held that their disposition of it to appellant cities would be otherwise permissible, yet it must be forbidden here because of the undoubted principle that no appropriator may change either the use or place of use of appropriated water to the detriment of others having superior rights in the common source of supply. Counsel for the respondent on that score contend: (1) that the change from agricultural to urban use of water results in increased loss by evaporation in ordinary seasons with diminished return flows to the stream but in increased rapidity of runoff in flood seasons with accompanying loss of water to the ocean; and (2) that such changes to urban uses also increase the pollution of the return flows to the stream through use of the water for manufacturing

and other industrial purposes and the injection of various deleterious mineral elements into the sewage effluent and the return flow from storm drains. Both of these contentions are completely outside any of the issues framed by the pleadings. Both have nevertheless been pressed upon the trial court over the objections of the appellants. Moreover, the trial court considered both at length and took voluminous evidence on the subject and upon sharply conflicting testimony found in each instance in favor of the respondent district and against the appellants. Not only has the result been, as already noted, an erroneous computation of the prescriptive rights of the appellant cities of Redlands and Riverside to themselves take water from the river system, but the matter has been carried into the judgment by the provisions, already noted, forbidding the appellant cities to *receive* water from the river system additional to that to which their own prescriptive rights entitle them "indirectly through the facilities of others within the Santa Ana watershed." As a result, we are in receipt of amici curiae briefs from counsel for mutual water companies and nonmunicipal agencies complaining that *their* rights to dispose of water to appellant cities have thus been cut off by the inhibition forbidding the cities to acquire it, and that an attempt has thus been made to bring to a halt the whole transition from a rural to an urban economy in the entire area involved. These contentions must be sustained. Respondent district has chosen to exclude these nonmunicipal agencies, though they are presumably large appropriators of water from the San Bernardino and other upstream basins from the number of parties defendant. While not necessary parties to the action, as its issues are framed by the pleadings, they are not only necessary but indispensable parties to any adjudication affecting their rights and no adjudication can be here made between respondent and appellants dealing with such subjects as the asserted detriment to the quantity or quality of the stream flow from the change from rural to urban uses of the waters of such agencies, without affecting their rights. The situation is precisely like that involved in *Thomson* v. *Talbert Drainage Dist.*, 168 Cal.App.2d 687 [336 P.2d 174], only recently decided by this court, and in point also is the even more recent case of *County of San Bernardino* v. *Harsh California Corp.*, 52 Cal.2d 341 [340 P.2d 617], decided by the Supreme Court on June 23, 1959. Also in point is *Miracle Adhesives Corp.* v. *Peninsula Title etc.*

*Assn.,* 157 Cal.App.2d 591, 593 [321 P.2d 482]. It is apparent that, unless the present case is to be retried *ab initio* with amended pleadings and the necessary additional parties, all findings having to do with the loss of water from its conversion to urban uses and all findings having to do with the pollution of water or of sewer effluent and all restrictions implied in the findings or contained in the judgment against the acquisition or receipt by appellant cities of water from the river system additional to what their own prescriptive rights entitle them to, from nonmunicipal agencies, must be stricken out.

It is not seriously contended that this action is barred by section 343 of the Code of Civil Procedure and therefore finding XVIII negativing such bar needs no comment.

Finding XIX is to the effect that the district "commenced this action as soon as it became apparent that defendants' production of water from the Santa Ana River was causing permanent and irreparable damage to plaintiff. We have had our attention directed to no evidence in the record in support of this statement. The finding goes on to say that the district "has prosecuted this action with due diligence," and that "there have been no laches in this case." In our opinion on the original application herein for a supersedeas (154 Cal.App.2d 345, 347) we stated the facts in regard to this situation so far as known to us and we will not here repeat what was there said. It is, of course, well settled that laches in commencing or prosecuting an action will be no bar to relief unless some prejudice to a defendant has resulted from it (*Cahill* v. *Superior Court,* 145 Cal. 42, 48 [78 P. 467]; *Thornton* v. *Middletown Educational Corp.,* 21 Cal.App.2d 707, 711 [70 P.2d 234].) In the present case there can be no doubt that appellant cities have for the most part been increasing their drafts upon the water supply of the river system year by year for a long time before this action was instituted. In the interval it cannot be otherwise than that many persons have come to live in them, invested funds and engaged in business, in the faith that they were assured of a water supply sufficient for their needs. We agree that, even in these circumstances the district, representing as it does a public interest, can hardly be deemed guilty of such laches as to bar it from objecting to an ever increasing appropriation from an already limited water supply to respondent's detriment. A finding, therefore, going no farther than to determine that it has not been guilty of such laches as to

bar this suit would have been justified. But the present finding goes too far. ██ Laches, though it be not such as, in the circumstances, to bar an action may still be considered insofar as it ought in equity to limit the relief given.

██ Finding XX is open to the same criticism that we have made of Finding XIX. We find no fault with so much of it as exculpates the district and those who have controlled its policies from *intending* to lead appellant cities or any of them to believe that the district surrendered or forfeited or would surrender or forfeit any of its rights to the waters of the Santa Ana River System; but the implication can easily be drawn from the rest of the finding that neither the appellant cities nor their inhabitants have been misled by the district's failure to earlier object to the appellants' increasing appropriation of water into believing that the district acquiesced therein. Insofar as the finding can be so construed it goes too far.

Counsel for the cities of San Bernardino, Colton and Redlands devote considerable space in their opening brief to what seems to us an insufficiently justified complaint of the atmosphere in which the trial was conducted. They return to the same subject in their closing brief. While some of the expressions of the trial judge are not to be commended, we are not convinced that they have in any way affected the result. We pass the matter without further comment.

██ Appellants complain that their repeated motions for a reference of the case to the State Division of Water Resources of the Department of Public Works, as it existed at the time of trial, were denied. As to this it is enough to say that no positive duty rested on the court to make such a reference (*Allen* v. *California Water & Tel. Co.*, 29 Cal.2d 466, 489 [176 P.2d 8].)

██ Appellants, as we have already noted, complain on various grounds, of the admissibility of great numbers of documentary exhibits, in some instances for immateriality, in others because they embody the opinion of persons not present to be examined, such as hydrological material in bulletins and reports published by the state. In fact we have never seen a transcript in which a greater proportion of the space is taken up by argument over objections to the admissibility of evidence—objections, we hasten to say, that were not made exclusively by either side. In a few instances where such exhibits were really of crucial importance in the determination of the

case we have already expressed our views as to their admissibility. Particular objection was made by all the appellant cities to the reading in evidence of parts of three reports prepared by Harold Conklin, one of the engineers for the cities of San Bernardino and Colton and a witness at the trial in their behalf, and the admission of certain plates taken from these reports. None of these reports were prepared by Conklin while in the employ of either city. One of them however (Plaintiff's Exhibit 81 for identification) was prepared for an association known as the Santa Ana River Water Supply Committee, composed of residents of the eastern part of the Santa Ana River area. Edward F. Dibble, the chief engineering witness for the cities of San Bernardino and Colton at the trial had been a director of this association and the chairman of its engineering committee and it sufficiently appears from the record that before his employment by either of said cities he collaborated with Conklin in the preparation of this report and spoke at a public meeting attended by the mayors of all or some of appellant cities at which this report was considered and expressed his approval of it. Conklin testified at the trial on direct examination for part of a day, mostly on preliminary matters not seriously controverted, but became ill and was not able further to appear and was never cross-examined. The trial court appeared to believe that the extracts read from these three reports and the plates from them admitted in evidence could properly be treated in the circumstances as admissions as against the cities of San Bernardino and Colton. We do not see that any of them could be properly treated as admissions against any of appellant cities. ■ Neither was it proper to use any of them to impeach the witness Conklin for he was not present to be confronted by them. The report to the Santa Ana River Water Supply Committee was in the circumstances properly admissible insofar as it tended to impeach the testimony of the witness Dibble, but for no other purpose, and the other two reports were not admissible for any purpose.

To deal with all of the remaining objections to evidence tendered and admitted would prolong this already long opinion to intolerable length. Undoubtedly much that was admitted was irrelevant to anything that the court had to determine, and other items may have been objectionable on other grounds. We cannot say, however, that, except perhaps the Conklin reports referred to, anything improperly

admitted could have affected such of the findings as we have held to be supported by the evidence, or in view of the disposition that we are making of the case that there is any necessity for reviewing in detail the rulings of the trial court in admitting it.

There has been some discussion in the briefs of views taken on his own initiative by the trial judge of the area covered by the river system, once or twice by airplane and in other instances by excursions over parts of the ground. Respondent's counsel suggest that his observations must be treated as evidentiary support for such findings as have been attacked. Appellants, on the contrary, contend that any views he may have taken of the localities involved were wholly informal and not in pursuance of any understanding with counsel, and that they may not be considered for any purpose. It must be apparent, however, that in an action of this type, involving, as it does, the resolution of questions highly technical in their nature, no casual inspections of the terrain could have enlightened the trial judge on the issues involved, otherwise than by aiding his comprehension of the obvious and undisputed features of the geography of the region. We cannot, therefore, regard any ''views'' that he may have taken as having any importance one way or the other in the disposition of the case.

We have, in the foregoing review of the findings, incidentally discussed sundry of the legal problems involved in the present appeals. It remains to consider the nature and extent of the relief to which the district has shown itself to be entitled. We are constrained to believe it entitled, subject to the retention of jurisdiction hereinafter provided for, except for temporary adjustments, to enjoin the defendant cities from extracting as appropriators from the Santa Ana River System any water in excess of that which their prescriptive rights entitled them to take. That such is the proper relief in a case like the one before us is established by many authorities. (*City of San Bernardino* v. *Riverside*, 186 Cal. 7, 16 [198 P. 784]; *Burr* v. *Maclay Rancho Water Co.*, 154 Cal. 428, 438, *supra*; *Coachella Valley County Water Dist.* v. *Stevens*, 206 Cal. 400, *supra*; *Eden etc. Water Dist.* v. *City of Hayward*, 218 Cal. 634, *supra*; *City of Lodi* v. *East Bay Municipal Utility Dist.*, 7 Cal.2d 316, 344 [60 P.2d 439]; *Allen* v. *California Water & Telephone Co.*, 29 Cal.2d 466, 485, 486 [176 P.2d 8]; *City of Pasadena* v. *City of Alhambra*, 33 Cal.2d

908, 924, 929 [207 P.2d 17]; *Orchard* v. *Cecil F. White Ranches, Inc.*, 97 Cal.App.2d 35 [217 P.2d 143]; *Smith* v. *Wheeler*, 107 Cal.App.2d 451 [237 P.2d 325]; *Monolith Portland Cement Co.* v. *Mojave P. U. Dist.*, 154 Cal.App.2d 487, 493, 494 [316 P.2d 713]; *Rank* v. *(Krug) United States*, 142 F.Supp. 1, 160, 177.)

 Counsel for the cities of San Bernardino, Colton and Redlands urge that: "When a public use of water has been established over a long period of years, without objection, a public interest has intervened and injunctive relief will not be granted."

To that effect they cite *Katz* v. *Walkinshaw*, 141 Cal. 116, 136, *supra*; *Barton* v. *Riverside Water Co.*, 155 Cal. 509, 515 [101 P. 790, 23 L.R.A. N.S. 331]; *Peabody* v. *City of Vallejo*, 2 Cal.2d 351 [40 P.2d 486]; *Miller & Lux, Inc.* v. *San Joaquin Light & Power Corp.*, 8 Cal.2d 427 [65 P.2d 1289]; *Hillside Water Co.* v. *City of Los Angeles*, 10 Cal.2d 677 [76 P.2d 681] and *Rank* v. *(Krug) United States*, 142 F.Supp. 1, *supra*.

The rule laid down in these authorities may not be questioned, but its application is not always an easy one. There is, of course, no question here of any interference with the prescriptive rights of appellant cities to take such water as prescription enables them to take. It must not be forgotten, however, that respondent is as much the representative of a public interest as are appellants. Certainly the rule relied on cannot be invoked to permit appellants to go on with indefinite and ever increasing enlargement of their appropriations despite the absence of surplus water. We think, however, that in equity the principle that it embodies may properly be applied to afford them some temporary relief from the strict limitation of their prescriptive rights. A measure of such relief was effected by the trial court's judgment, which, in order to allow appellants reasonable time to acquire supplementary supplies of water from sources outside the Santa Ana River watershed, permitted each of them for a period of three years from the date of entry of the judgment, to continue to produce water in excess of that to which it is entitled by prescription, provided:

"A. That each defendant so producing such excess amount in any water year shall cause to be delivered to the plaintiff during the next succeeding water year water equivalent in quantity and quality to the amount of such excess from a source other than the natural supply of the Santa Ana River

System; such deliveries to be made to plaintiff, without cost to plaintiff, at such times, at such rates of delivery and at such locations as designated by plaintiff; or

"B. In lieu of delivery to plaintiff water in the manner set forth in Subparagraph A above, defendant taking such excess water as herein provided shall pay to plaintiff within 30 days after the end of the water year in which such excess is taken an amount of money equal to the then prevailing cost to plaintiff of purchasing a like amount of water from the facilities of the Metropolitan Water District of Southern California."

It seems to us that, in lieu of these provisions, the ultimate judgment herein may properly provide that within three years from the date on which it shall become final in the highest court in which it shall be considered, each of the appellants may continue to produce appropriated water from the Santa Ana River System in excess of that to which its prescriptive rights entitle it, provided that none of appellants shall be entitled to take such water in excess of the amounts of water which it was taking on June 7, 1957, the date when the original judgment in the case was entered, and provided further, that no prescriptive rights as against the respondent additional to those which such appellants had at the date on which this action was filed, shall ever be deemed to accrue to them by reason of such temporary taking of water in excess of their prescriptive rights.

In view of our conclusion hereinbefore stated in connection with our discussion of finding XVI that there is no sufficient evidence of any exactly ascertainable quantitative relation between particular drafts of water by appellant cities or any of them, and deficiencies in the water flow to the plaintiff district, it seems to us inappropriate to require appellants to compensate respondent district for any such excess withdrawal of water, in either of the ways contemplated by the trial court or otherwise.

The judgment should ascertain in acre feet per annum, recomputed according to the principles hereinbefore laid down, the amount of the prescriptive right of each of appellant cities to produce water from the Santa Ana River System, and subject to the court's reservation of jurisdiction hereinafter stated, perpetually enjoin it from producing water therefrom in excess of such prescriptive right except for the temporarily permitted excess production above mentioned.

The judgment should exclude from the computation of such prescriptive rights all production by appellants or any of them, made in the exercise of riparian or overlying, as distinguished from prescriptive rights, and make it clear that its inhibitions do not extend to such exercise of such riparian or overlying rights. It should also exclude from this computation of the prescriptive rights of appellant cities the amounts of all appropriated water obtained or that may be obtained by any of them by virtue of stock in mutual water companies or other nonmunicipal agencies having prescriptive rights to produce water from the river system, and should make it clear that the inhibitions imposed by the judgment have no application to acquisition by appellant cities of additional water from such mutual water companies or other nonmunicipal agencies, provided that, in furnishing such water, such mutual water companies or other agencies do not withdraw from the river system more water than their own prescriptive rights entitle them to withdraw.

The judgment should reserve to the court full jurisdiction, power and authority to modify, amend or amplify any of its provisions whenever climatic changes or other developments affecting the physical, hydrological or other conditions, therein dealt with, may in the court's opinion justify or require such modification, amendment or amplification of its terms, and to make and enter all supplemental orders and take all supplemental proceedings which the court may deem necessary or proper to enforce its provisions or the provisions of any modification, amendment or amplification thereof, either upon the court's own motion or upon the application of any of the parties to this action.

There need not be any retrial of this action *in extenso*. Modified findings may be made by the trial court, not inconsistent with the views hereinbefore expressed from the evidence already in hand plus such additional evidence, if any, as may be needed to accomplish the recomputations of appellants' prescriptive rights now required.

The judgment is reversed and the trial court is directed to make new findings and to enter a new judgment not inconsistent with the views hereinbefore expressed.

In the interests of justice it is ordered that respondent pay one-half of the cost of preparing the transcript on appeal; the other half to be paid by appellants in the propor-

tion in which they have contributed to such preparation costs. All other costs to be paid by the parties incurring them.

Griffin, P. J., and Shepard, J., concurred.

The petitions of appellant City of Riverside and respondent Orange County Water District for a rehearing were denied September 18, 1959, and their petitions for a hearing by the Supreme Court were denied October 15, 1959.